## LEE *v.* KEMNA, SUPERINTENDENT, CROSSROADS CORRECTIONAL CENTER

No. 00–6933.   Argued October 29, 2001—Decided January 22, 2002

GINSBURG, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and STEVENS, O'CONNOR, SOUTER, and BREYER, JJ., joined. KENNEDY, J., filed a dissenting opinion, in which SCALIA and THOMAS, JJ., joined, *post*, p. 388.

*Bonnie I. Robin-Vergeer*, by appointment of the Court, 532 U. S. 956, argued the cause for petitioner. With her on the briefs were *David C. Vladeck* and *Alan B. Morrison.*

*Paul C. Wilson* argued the cause for respondent. With him on the brief were *Jeremiah W. (Jay) Nixon*, Attorney General of Missouri, *James R. Layton*, State Solicitor, and *Michael J. Spillane*, Assistant Attorney General.*

---

*Briefs of *amici curiae* urging affirmance were filed for the State of Nebraska et al. by *Don Stenberg*, Attorney General of Nebraska, *Martin Swanson*, Assistant Attorney General, and *Dan Schweitzer*, joined by the Attorneys General for their respective States as follows: *Bill Pryor* of Alabama, *Bruce M. Botelho* of Alaska, *Mark Pryor* of Arkansas, *Bill Lockyer* of California, *Ken Salazar* of Colorado, *Thurbert E. Baker* of Georgia, *Carla J. Stovall* of Kansas, *J. Joseph Curran, Jr.*, of Maryland, *Mike*

JUSTICE GINSBURG delivered the opinion of the Court.

Petitioner Remon Lee asserts that a Missouri trial court deprived him of due process when the court refused to grant an overnight continuance of his trial. Lee sought the continuance to locate subpoenaed, previously present, but suddenly missing witnesses key to his defense against felony charges. On direct review, the Missouri Court of Appeals disposed of the case on a state procedural ground. That court found the continuance motion defective under the State's rules. It therefore declined to consider the merits of Lee's plea that the trial court had denied him a fair opportunity to present a defense. Whether the state ground dispositive in the Missouri Court of Appeals is adequate to preclude federal habeas corpus review is the question we here consider and decide.

On the third day of his trial, Lee was convicted of first-degree murder and armed criminal action. His sole affirmative defense was an alibi; Lee maintained he was in California, staying with his family, when the Kansas City crimes for which he was indicted occurred. Lee's mother, stepfather, and sister voluntarily came to Missouri to testify on his behalf. They were sequestered in the courthouse at the start of the trial's third day. For reasons then unknown, they were not in the courthouse later in the day when defense counsel sought to present their testimony. Discovering their absence, defense counsel moved for a continuance until the next morning so that he could endeavor to locate the three witnesses and bring them back to court.

The trial judge denied the motion, stating that it looked to him as though the witnesses had "in effect abandoned

*Moore* of Mississippi, *Mike McGrath* of Montana, *Frankie Sue Del Papa* of Nevada, *Betty D. Montgomery* of Ohio, *W. A. Drew Edmondson* of Oklahoma, *D. Michael Fisher* of Pennsylvania, *Charles M. Condon* of South Carolina, and *Mark L. Shurtleff* of Utah; and for the Criminal Justice Legal Foundation by *Kent S. Scheidegger.*

the defendant" and that, for personal reasons, he would "not be able to be [in court the next day] to try the case." Furthermore, he had "another case set for trial" the next weekday. App. 22. The trial resumed without pause, no alibi witnesses testified, and the jury found Lee guilty as charged.

Neither the trial judge nor the prosecutor identified any procedural flaw in the presentation or content of Lee's motion for a continuance. The Missouri Court of Appeals, however, held the denial of the motion proper because Lee's counsel had failed to comply with Missouri Supreme Court Rules not relied upon or even mentioned in the trial court: Rule 24.09, which requires that continuance motions be in written form, accompanied by an affidavit; and Rule 24.10, which sets out the showings a movant must make to gain a continuance grounded on the absence of witnesses.

We hold that the Missouri Rules, as injected into this case by the state appellate court, did not constitute a state ground adequate to bar federal habeas review. Caught in the midst of a murder trial and unalerted to any procedural defect in his presentation, defense counsel could hardly be expected to divert his attention from the proceedings rapidly unfolding in the courtroom and train, instead, on preparation of a written motion and affidavit. Furthermore, the trial court, at the time Lee moved for a continuance, had in clear view the information needed to rule intelligently on the merits of the motion. Beyond doubt, Rule 24.10 serves the State's important interest in regulating motions for a continuance— motions readily susceptible to use as a delaying tactic. But under the circumstances of this case, we hold that petitioner Lee, having substantially, if imperfectly, made the basic showings Rule 24.10 prescribes, qualifies for adjudication of his federal, due process claim. His asserted right to defend should not depend on a formal "ritual . . . [that] would further no perceivable state interest." *Osborne* v. *Ohio,* 495 U. S.

103, 124 (1990) (quoting *James* v. *Kentucky,* 466 U. S. 341, 349 (1984) (in turn quoting *Staub* v. *City of Baxley,* 355 U. S. 313, 320 (1958))) (internal quotation marks omitted).

## I

On August 27, 1992, Reginald Rhodes shot and killed Steven Shelby on a public street in Kansas City, Missouri. He then jumped into the passenger side of a waiting truck, which sped away. Rhodes pleaded guilty, and Remon Lee, the alleged getaway driver, was tried for first-degree murder and armed criminal action.

Lee's trial took place within the span of three days in February 1994. His planned alibi defense—that he was in California with his family at the time of the murder—surfaced at each stage of the proceedings. During *voir dire* on the first day of trial, Lee's court-appointed defense attorney informed prospective jurors that "[t]here will be a defense in this case, which is a defense of alibi." App. 10; see also *ibid.* ("And we'll put on evidence—I can't go into it now—that he was somewhere else, he couldn't commit the crime and I believe the judge will give an instruction on alibi at the conclusion of my case."). Later in the *voir dire*, defense counsel identified the three alibi witnesses as Lee's mother, Gladys Edwards, Lee's sister, Laura Lee, and Lee's stepfather, James Edwards, a minister. *Id.,* at 11–13.

The planned alibi defense figured prominently in counsels' opening statements on day two of Lee's trial. The prosecutor, at the close of her statement, said she expected an alibi defense from Lee and would present testimony to disprove it. Tr. 187. Defense counsel, in his opening statement, described the alibi defense in detail, telling the jury that the evidence would show Lee was not in Kansas City, and therefore could not have engaged in crime there, in August 1992. App. 12–13. Specifically, defense counsel said three close family members would testify that Lee came to visit them in

Ventura, California, in July 1992 and stayed through the end of October. Lee's mother and stepfather would say they picked him up from the airport at the start of his visit and returned him there at the end. Lee's sister would testify that Lee resided with her and her four children during this time. All three would affirm that they saw Lee regularly throughout his unbroken sojourn. *Ibid.*

During the prosecution case, two eyewitnesses to the shooting identified Lee as the driver. The first, Reginald Williams, admitted during cross-examination that he had told Lee's first defense counsel in a taped interview that Rhodes, not Lee, was the driver. Tr. 285. Williams said he had given that response because he misunderstood the question and did not want to be "bothered" by the interviewer. *Id.*, at 283, 287. The second eyewitness, William Sanders, was unable to pick Lee out of a photographic array on the day of the shooting; Sanders identified Lee as the driver for the first time 18 months after the murder. *Id.*, at 413–414.

Two other witnesses, Rhonda Shelby and Lynne Bryant, were called by the prosecutor. Each testified that she knew Lee and had seen him in Kansas City the night before the murder. Both said Lee was with Rhodes, who had asked where Steven Shelby (the murder victim) was. *Id.*, at 443–487. The State offered no physical evidence connecting Lee to the murder and did not suggest a motive.

The defense case began at 10:25 a.m. on the third and final day of trial. Two impeachment witnesses testified that morning. Just after noon, counsel met with the trial judge in chambers for a charge conference. At that meeting, the judge apparently agreed to give an alibi instruction submitted by Lee. *Id.*, at 571.[1]

---

[1] That Lee had submitted an alibi instruction during the charge conference became apparent when the trial judge, delivering the charge, began to read the proposed instruction. He was interrupted by the prosecutor

At some point in the late morning or early afternoon, the alibi witnesses left the courthouse. Just after one o'clock, Lee took the stand outside the presence of the jury and, for the record, responded to his counsel's questions concerning his knowledge of the witnesses' unanticipated absence. App. 15. Lee, under oath, stated that Gladys and James Edwards and Laura Lee had voluntarily traveled from California to testify on his behalf. *Id.*, at 16. He affirmed his counsel's representations that the three witnesses, then staying with Lee's uncle in Kansas City, had met with Lee's counsel and received subpoenas from him; he similarly affirmed that the witnesses had met with a Kansas City police officer, who interviewed them on behalf of the prosecutor. *Id.*, at 16–18. Lee said he had seen his sister, mother, and stepfather in the courthouse that morning at 8:30 and later during a recess.

On discovering the witnesses' absence, Lee could not call them at his uncle's house because there was no phone on the premises. He asked his girlfriend to try to find the witnesses, but she was unable to do so. *Id.*, at 17. Although Lee did not know the witnesses' whereabouts at that moment, he said he knew "in fact they didn't go back to California" because "they [had] some ministering . . . to do" in Kansas City both Thursday and Friday evenings. *Id.*, at 18. He asked for "a couple hours' continuance [to] try to locate them, because it's very valuable to my case." *Ibid.* Defense counsel subsequently moved for a continuance until the next morning, to gain time to enforce the subpoenas he had served on the witnesses. *Id.*, at 20. The trial judge responded that he could not hold court the next day because "my daughter is going to be in the hospital all day . . . [s]o I've got to stay with her." *Ibid.*

---

and defense counsel, who reminded him that the instruction was no longer necessary. Tr. 594–595.

After a brief further exchange between court and counsel,[2] the judge denied the continuance request. The judge observed:

> "It looks to me as though the folks were here and then in effect abandoned the defendant. And that, of course, we can't—we can't blame that on the State. The State had absolutely nothing to do with that. That's—it's too bad. The Court will not be able to be here tomorrow to try the case." *Id.*, at 22.

Counsel then asked for a postponement until Monday (the next business day after the Friday the judge was to spend with his daughter in the hospital). The judge denied that request too, noting that he had another case set for trial that day. *Ibid.*

In a final colloquy before the jury returned to the courtroom, defense counsel told the court he would be making a motion for judgment of acquittal. The judge asked, "You're going to give that to me . . . orally and you'll supplement that with a written motion?" Counsel agreed. *Id.*, at 23.

When the jurors returned, defense counsel informed them that the three witnesses from California he had planned to call "were here and have gone"; further, counsel did not "know why they've gone." *Id.*, at 25. The defense then rested. In closing argument, Lee's counsel returned to the alibi defense he was unable to present. "I do apologize," he said, "I don't know what happened to my witnesses. They're not here. Couldn't put them on on the question of alibi." *Id.*, at 26. The prosecutor commented on the same gap: "Where are those alibi witnesses that [defense counsel] promised you from opening[?] They're not here." *Id.*, at 27.

---

[2] Responding to the court's questions, Lee's counsel said he had copies of the witnesses' written statements and their subpoenas. App. 20–21. Counsel next began to describe the subpoenas. When counsel listed Gladys Edwards, the court asked "[i]s she the mother?" *Id.*, at 21.

After deliberating for three hours, the jury convicted Lee on both counts. He was subsequently sentenced to prison for life without possibility of parole. *Id.*, at 43.

The trial court later denied Lee's new trial motion, which Lee grounded, in part, on the denial of the continuance motion. *Id.*, at 31–32, 42. Lee, at first *pro se* but later represented by appointed counsel, next filed a motion for state postconviction relief. Lee argued, *inter alia*, that the refusal to grant his request for an overnight continuance deprived him of his federal constitutional right to a defense. *Id.*, at 56–59.[3] In his postconviction motion, Lee asserted that the three witnesses had left the courthouse ·because "an unknown person," whom he later identified as an employee of the prosecutor's office, had told them "they were not needed to testify." *Id.*, at 56–58. The postconviction court denied the motion, stating that under Missouri law, an allegedly improper denial of a continuance fits within the category "trial error," a matter to be raised on direct appeal, not in a collateral challenge to a conviction. *Id.*, at 70.

Lee's direct appeal and his appeal from the denial of postconviction relief were consolidated before the Missouri Court of Appeals. See Mo. Sup. Ct. Rule 29.15(*l*) (1994). There, Lee again urged that the trial court's refusal to continue the case overnight denied him due process and the right to put on a defense. App. 90–95. In response, the State argued for the first time that Lee's continuance request had a fatal procedural flaw. *Id.*, at 110–115. In particular, the State contended that Lee's application failed to comply with Missouri Supreme Court Rule 24.10 (Rule 24.10), which lists the showings required in a continuance request based on

---

[3] Missouri procedure at the time required Lee to file his postconviction motion in the sentencing court shortly after he filed his notice of direct appeal. See Mo. Sup. Ct. Rule 29.15(b) (1994) (requiring motion to be made within 30 days of filing of court transcript in appellate court considering direct appeal). The direct appeal was "suspended" while the trial court considered the postconviction motion. See Rule 29.15(*l*).

372

the absence of witnesses.[4]  By the State's reckoning, Lee's request did not show the materiality of the California witnesses' testimony or the grounds for believing that the witnesses could be found within a reasonable time; in addition, the prosecution urged, Lee failed to "testify that the witnesse[s'] absence was not due to his own procurement." App. 113.

The Missouri Court of Appeals affirmed Lee's conviction and the denial of postconviction relief. *State* v. *Lee,* 935 S. W. 2d 689 (1996); App. 123–131.   The appellate court first noted that Lee's continuance motion was oral and therefore did not comply with Missouri Supreme Court Rule 24.09 (Rule 24.09), which provides that such applications shall be in written form, accompanied by an affidavit.   App. 126–127.[5]

---

[4] Rule 24.10 reads:

"Misdemeanors or Felonies—Application for a Continuance on Account of Absence of Witnesses Shall Show What

"An application for a continuance on account of the absence of witnesses or their evidence shall show:

"(a) The facts showing the materiality of the evidence sought to be obtained and due diligence upon the part of the applicant to obtain such witness or testimony;

"(b) The name and residence of such witness, if known, or, if not known, the use of diligence to obtain the same, and also facts showing reasonable grounds for belief that the attendance or testimony of such witness will be procured within a reasonable time;

"(c) What particular facts the affiant believes the witness will prove, and that he knows of no other person whose evidence or attendance he could have procured at the trial, by whom he can prove or so fully prove the same facts;

"(d) That such witness is not absent by the connivance, consent, or procurement of the applicant, and such application is not made for vexation or delay, but in good faith for the purpose of obtaining a fair and impartial trial.

"If the court shall be of the opinion that the affidavit is insufficient it shall permit it to be amended."

[5] Rule 24.09 reads:

"Misdemeanors or Felonies—Application for Continuance—How Made

"An application for a continuance shall be made by a written motion accompanied by the affidavit of the applicant or some other credible person

"Thus," the Court of Appeals said, "the trial court could have properly denied the motion for a failure to comply with Rule 24.09." *Id.*, at 127. Even assuming the adequacy of Lee's oral motion, the court continued, the application "was made without the factual showing required by Rule 24.10." *Ibid.* The court did not say which components of Rule 24.10 were unsatisfied. "When a denial to grant a motion for continuance is based on a deficient application," the Court of Appeals next said, "it does not constitute an abuse of discretion." *Ibid.* Lee's subsequent motions for rehearing and transfer to the Missouri Supreme Court were denied.

In January 1998, Lee, proceeding *pro se,* filed an application for writ of habeas corpus in the United States District Court for the Western District of Missouri. *Id.*, at 132. Lee once again challenged the denial of his continuance motion. *Id.*, at 147–152. He appended affidavits from the three witnesses, each of whom swore to Lee's alibi; sister, mother, and stepfather alike stated that they had left the courthouse while the trial was underway because a court officer told them their testimony would not be needed that day. *Id.*, at 168–174.[6] Lee maintained that the State had engineered the witnesses' departure; accordingly, he as-

---

setting forth the facts upon which the application is based, unless the adverse party consents that the application for continuance may be made orally."

[6] The witnesses' accounts of their departure from the courthouse were as follows:

Laura Lee: "[T]hose people in Missouri told us we could leave because OUR TESTIMONY would not be needed until the next day." App. 169.

Gladys Edwards: "[T]he officer of the court came and told us that the prosecutor stated that the state[']s case will again take up the remainder of that day. That [o]ur testimony will not be needed until the following day, that we could leave until the following day. He . . . told [u]s not to worry, the Judge knows *[w]e came to testify,* they have [o]ur statements, and the trial will not be over until we testify. So at those instructions we left." *Id.*, at 172.

James Edwards: "[W]hile at the [c]ourthouse, we were told by an officer of the court that [o]ur testimony would not be needed until the following day, we were excused until then." *Id.*, at 174.

serted that prosecutorial misconduct, not anything over which he had control, prompted the need for a continuance. *Id.*, at 148, 155–156.

The District Court denied the writ. No. 98–0074–CV–W–6–P (WD Mo., Apr. 19, 1999), App. 212–218. The witnesses' affidavits were not cognizable in federal habeas proceedings, the court held, because Lee could have offered them to the state courts but failed to do so. *Id.*, at 215 (citing 28 U. S. C. § 2254(e) (1994 ed., Supp. V)). The Federal District Court went on to reject Lee's continuance claim, finding in the Missouri Court of Appeals' invocation of Rule 24.10 an adequate and independent state-law ground barring further review. App. 217.

The Court of Appeals for the Eighth Circuit granted a certificate of appealability, limited to the question whether Lee's "due process rights were violated by the state trial court's failure to allow him a continuance," *id.*, at 232, and affirmed the denial of Lee's habeas petition. 213 F. 3d 1037 (2000) *(per curiam).* Federal review of Lee's due process claim would be unavailable, the court correctly observed, if the state court's rejection of that claim " 'rest[ed] . . . on a state law ground that is independent of the federal question and adequate to support the judgment,' regardless of 'whether the state law ground is substantive or procedural.' " *Id.*, at 1038 (quoting *Coleman* v. *Thompson,* 501 U. S. 722, 729 (1991)). "The Missouri Court of Appeals rejected Lee's claim because his motion for a continuance did not comply with [Rules] 24.09 and 24.10," the Eighth Circuit next stated. Thus, that court concluded, "the claim was procedurally defaulted." 213 F. 3d, at 1038.[7]

---

[7] Lee had asked the federal appeals court to excuse the procedural lapse, suggesting that trial counsel's failure to follow Missouri's motion rules qualified as ineffective assistance of counsel. Lee had not exhausted that claim in state court, the Eighth Circuit responded, therefore he could not assert it in federal habeas proceedings. 213 F. 3d, at 1038. Furthermore, the federal appeals court ruled, Lee could not rest on a plea of

Chief District Judge Bennett, sitting by designation from the District Court for the Northern District of Iowa, dissented. In his view, Rules 24.09 and 24.10 did not supply state-law grounds "adequate" to preclude federal review in the particular circumstances of this case. *Id.*, at 1041–1049.

We granted Lee's *pro se* petition for a writ of certiorari, 531 U. S. 1189 (2001), and appointed counsel, 532 U. S. 956 (2001). We now vacate the Court of Appeals judgment.

## II

This Court will not take up a question of federal law presented in a case "if the decision of [the state] court rests on a state law ground that is *independent* of the federal question and *adequate* to support the judgment." *Coleman* v. *Thompson*, 501 U. S. 722, 729 (1991) (emphases added). The rule applies with equal force whether the state-law ground is substantive or procedural. *Ibid.* We first developed the independent and adequate state ground doctrine in cases on direct review from state courts, and later applied it as well "in deciding whether federal district courts should address the claims of state prisoners in habeas corpus actions." *Ibid.* "[T]he adequacy of state procedural bars to the assertion of federal questions," we have recognized, is not within the State's prerogative finally to decide; rather, adequacy "is itself a federal question." *Douglas* v. *Alabama*, 380 U. S. 415, 422 (1965).

Lee does not suggest that Rules 24.09 and 24.10, as brought to bear on this case by the Missouri Court of Appeals, depended in any way on federal law. Nor does he question the general applicability of the two codified Rules. He does maintain that both Rules—addressed initially to Missouri trial courts, but in his case invoked only at the

"actual innocence" to escape the procedural bar because "the factual basis for the [alibi witness] affidavits he relies on as new evidence existed at the time of the trial and could have been presented earlier." *Id.*, at 1039.

appellate stage—are inadequate, under the extraordinary circumstances of this case, to close out his federal, fair-opportunity-to-defend claim. We now turn to that dispositive issue.[8]

Ordinarily, violation of "firmly established and regularly followed" state rules—for example, those involved in this case—will be adequate to foreclose review of a federal claim. *James* v. *Kentucky,* 466 U. S. 341, 348 (1984); see *Ford* v. *Georgia,* 498 U. S. 411, 422–424 (1991). There are, however, exceptional cases in which exorbitant application of a generally sound rule renders the state ground inadequate to stop consideration of a federal question. See *Davis* v. *Wechsler,* 263 U. S. 22, 24 (1923) (Holmes, J.) ("Whatever springes the State may set for those who are endeavoring to assert rights that the State confers, the assertion of federal rights, when plainly and reasonably made, is not to be defeated under the name of local practice."). This case fits within that limited category.

Our analysis and conclusion are informed and controlled by *Osborne* v. *Ohio,* 495 U. S. 103 (1990). There, the Court considered Osborne's objections that his child pornography conviction violated due process because the trial judge had not required the government to prove two elements of the alleged crime: lewd exhibition and scienter. *Id.,* at 107, 122–125. The Ohio Supreme Court held the constitutional objections procedurally barred because Osborne had failed to

---

[8] Missouri argues in two footnotes to its brief that Lee's federal claim fails for a reason independent of Rules 24.09 and 24.10, namely, that he raised only state-law objections to denial of the continuance motion in state court. Brief for Respondent 16, n. 2, 32, n. 7. Lee urges, in response, that his direct appeal brief explicitly invoked due process and his right to present witnesses in his defense as guaranteed by the Fifth, Sixth, and Fourteenth Amendments. Reply Brief 11, n. 4 (citing App. 86–87, 90–95). Missouri did not advance its current contention in the State's Eighth Circuit brief or in its brief in opposition to the petition for certiorari. We therefore exercise "our discretion to deem the [alleged] defect waived." *Oklahoma City* v. *Tuttle,* 471 U. S. 808, 816 (1985).

object contemporaneously to the judge's charge, which did not instruct the jury that it could convict only for conduct that satisfied both the scienter and the lewdness elements. *Id.*, at 107–108, 123; see Ohio Rule Crim. Proc. 30(A) (1989) ("A party may not assign as error the giving or the failure to give any instructions unless he objects thereto before the jury retires to consider its verdict, stating specifically the matter to which he objects and the grounds of his objection.").

We agreed with the State that Osborne's failure to urge the trial court to instruct the jury on scienter qualified as an "adequate state-law ground [to] preven[t] us from reaching Osborne's due process contention on that point." 495 U. S., at 123. Ohio law, which was not in doubt, required proof of scienter unless the applicable statute specified otherwise. *Id.*, at 112–113, n. 9, 123. The State's contemporaneous objection rule, we observed, "serves the State's important interest in ensuring that counsel do their part in preventing trial courts from providing juries with erroneous instructions." *Id.*, at 123.

"With respect to the trial court's failure to instruct on lewdness, however, we reach[ed] a different conclusion." *Ibid.* Counsel for Osborne had made his position on that essential element clear in a motion to dismiss overruled just before trial, and the trial judge, "in no uncertain terms," *id.*, at 124, had rejected counsel's argument. After a brief trial, the judge charged the jury in line with his ruling against Osborne on the pretrial motion to dismiss. Counsel's failure to object to the charge by reasserting the argument he had made unsuccessfully on the motion to dismiss, we held, did not deter our disposition of the constitutional question. "Given this sequence of events," we explained, it was proper to "reach Osborne's [second] due process claim," for Osborne's attorney had "pressed the issue of the State's failure of proof on lewdness before the trial court and . . . nothing would be gained by requiring Osborne's lawyer to

object a second time, specifically to the jury instructions."
*Ibid.* In other words, although we did not doubt the general
applicability of the Ohio Rule of Criminal Procedure requir-
ing contemporaneous objection to jury charges, we neverthe-
less concluded that, in this atypical instance, the Rule would
serve "no perceivable state interest." *Ibid.* (internal quota-
tion marks omitted).

Our decision, we added in *Osborne*, followed from "the
general principle that an objection which is ample and timely
to bring the alleged federal error to the attention of the
trial court and enable it to take appropriate corrective action
is sufficient to serve legitimate state interests, and there-
fore sufficient to preserve the claim for review here." *Id.*,
at 125 (quoting *Douglas*, 380 U. S., at 422 (internal quotation
marks omitted)). This general principle, and the unusual
"sequence of events" before us—rapidly unfolding events
that Lee and his counsel could not have foreseen, and for
which they were not at all responsible—similarly guide our
judgment in this case.

The dissent strives mightily to distinguish *Osborne*, an
opinion JUSTICES KENNEDY and SCALIA joined, but cannot
do so convincingly. In an intricate discussion of *Osborne*
longer than the relevant section of *Osborne* itself, the dissent
crafts its own rationales for the decision and sweeps away
language its design cannot accommodate as "unnecessary"
and "in tension" with the rest of the Court's analysis, *post*,
at 399.

As attentive reading of the relevant pages of *Osborne* will
confirm, 495 U. S., at 123–125, we here rely not on "isolated
statements" from the opinion, *post*, at 396, but solidly on its
analysis and holding on "the adequacy of state procedural
bars to the assertion of federal questions." 495 U. S., at 125
(quoting *Douglas*, 380 U. S., at 422 (internal quotation
marks omitted)).

According to the dissent in this case, *Osborne*'s discrete
section trained on the adequacy of state-law grounds to bar

federal review had two bases. First, the dissent views as central to *Osborne* the "unforeseeab[ility]" of the Ohio Supreme Court's limiting construction of the child pornography statute at issue there, *i. e.*, that court's addition of the "lewdness" element on which Osborne failed to request a jury charge. *Post*, at 397–398; see also *post*, at 399. The dissent here is characteristically inventive. *Osborne* spoke not of the predictability *vel non* of the Ohio Supreme Court's construction; instead, this Court asked whether anything "would be gained by requiring Osborne's lawyer to object a second time" on the question of lewdness, 495 U. S., at 124, and answered that question with a firm "no." Tellingly, *Osborne* noted, without criticism, the Ohio Supreme Court's own indication that the limiting construction of the child pornography statute was *not* unpredictable, for it flowed from the "proper purposes" exceptions set out by the Legislature. *Id.*, at 113, n. 10.

Second, the dissent suggests that *Osborne* is enlightening only as to "Ohio's treatment of overbreadth objections." *Post*, at 398. *Osborne*, the dissent contends, "stands for the proposition that once a trial court rejects an overbreadth challenge, the defendant cannot be expected . . . to lodge a foreclosed objection to the jury instructions." *Post*, at 399. In truth, Ohio had no special-to-the-First Amendment "requirement." *Ibid.*[9] Rather, Ohio's firmly established, generally applicable practice was a standard contemporaneous objection rule for challenges to jury charges. See Ohio Rule Crim. Proc. 30(A) (1989). As *Osborne* paradigmatically illustrates, that Rule is unassailable in most instances, *i. e.*, it ordinarily serves a legitimate governmental interest; in rare

---

[9] The discrete section of *Osborne* in point, Part III, cites no First Amendment decision; it relies solely on decisions holding asserted state-law grounds inadequate in other contexts. See *Osborne v. Ohio*, 495 U. S. 103, 122–125 (1990) (citing *James v. Kentucky*, 466 U. S. 341, 349 (1984); *Davis v. Wechsler*, 263 U. S. 22, 24 (1923); *Douglas v. Alabama*, 380 U. S. 415, 421–422 (1965)).

circumstances, however, unyielding application of the general rule would disserve any perceivable interest.

The asserted procedural oversights in Lee's case, his alleged failures fully to comply with Rules 24.09 and 24.10, were first raised more than two and a half years after Lee's trial. The two Rules, Missouri maintains, "work together to enhance the reliability of a *trial court's* determination of whether to delay a scheduled criminal trial due to the absence of a witness." Brief for Respondent 29 (footnote omitted) (emphasis added). Nevertheless, neither the prosecutor nor the trial judge so much as mentioned the Rules as a reason for denying Lee's continuance motion.[10] If either prosecutor or judge considered supplementation of Lee's motion necessary, they likely would have alerted the defense at the appropriate time, and Lee would have had an opportunity to perfect his plea to hold the case over until the next day. Rule 24.10, we note, after listing the components of a continuance motion, contemplates subsequent perfection: "If the court shall be of the opinion that the affidavit is insufficient it shall permit it to be amended."

The State, once content that the continuance motion was ripe for trial court disposition on the merits, had a second thought on appeal. It raised Rule 24.10 as a new argument in its brief to the Missouri Court of Appeals; even then, the State did not object to the motion's oral form. App. 107–108, 110–115. The Missouri Court of Appeals, it seems, raised Rule 24.09's writing requirements ("a written motion accompanied by [an] affidavit") on its own motion.[11]

---

[10] By contrast, the judge specifically directed Lee's counsel to supplement counsel's oral motion for judgment of acquittal with a written motion. See *supra*, at 370.

[11] The belated assertion of these Rules also explains why Lee did not contend in his state postconviction motion that counsel was constitutionally ineffective for failing meticulously to comply with Rules 24.09 and 24.10. That postconviction motion had been made and denied in the trial court before the Rules' entry into the case when Lee proceeded on appeal. See *supra*, at 371, n. 3.

Three considerations, in combination, lead us to conclude that this case falls within the small category of cases in which asserted state grounds are inadequate to block adjudication of a federal claim. First, when the trial judge denied Lee's motion, he stated a reason that could not have been countered by a perfect motion for continuance. The judge said he could not carry the trial over until the next day because he had to be with his daughter in the hospital; the judge further informed counsel that another scheduled trial prevented him from concluding Lee's case on the following business day. Although the judge hypothesized that the witnesses had "abandoned" Lee, *id.*, at 22, he had not "a scintilla of evidence or a shred of information" on which to base this supposition, 213 F. 3d, at 1040 (Bennett, C. J., dissenting).[12]

---

[12] The dissent suggests that Lee's counsel decided not to put on the alibi defense promised in his opening statement because the prosecution's witnesses caused that planned defense to "collaps[e] altogether." See *post*, at 402. The record refutes that suggestion. Lee's counsel knew *before* he promised an alibi defense in his opening that the State planned to rebut it: The prosecutor's opening statement—given prior to defense counsel's— outlined the rebuttal witnesses' expected testimony. Tr. 178–187. Likewise, the prosecutor's statement that she "had in reserve other witnesses prepared to rebut the alibi testimony," *post*, at 403, was part of her opening statement, see Tr. 187. Furthermore, the alibi witnesses would have known of Lee's sentence in an unrelated case—a fact that the dissent suggests gave them "second thoughts" about testifying, *post*, at 403—a month before they traveled to Missouri. Tr. 25–26.

Utterly confounding are the dissent's depictions of "the realities of trial," *post*, at 400, capped by the statement that "[b]efore any careful trial judge granted a continuance in these circumstances, he or she would want a representation that the movant believed the missing witnesses were still prepared to offer the alibi testimony," *post*, at 403. Rule 24.10, the dissent insists, if meticulously observed, would have produced the very thing the court "needed to grant the motion: an assurance that the defense witnesses were still prepared to offer material testimony." *Post*, at 400; see *post*, at 403. No motion in the immediacy of the witnesses' sudden disappearance, however, could have provided assurance that they were still prepared to offer material testimony. The "careful trial judge" does not

Second, no published Missouri decision directs flawless compliance with Rules 24.09 and 24.10 in the unique circumstances this case presents—the sudden, unanticipated, and at the time unexplained disappearance of critical, subpoenaed witnesses on what became the trial's last day.[13] Lee's predicament, from all that appears, was one Missouri courts had not confronted before. "[A]lthough [the rules themselves] may not [have been] novel, . . . [their] application to the facts here was." *Sullivan* v. *Little Hunting Park, Inc.*, 396 U. S. 229, 245 (1969) (Harlan, J., dissenting).

. Third and most important, given "the realities of trial," *post*, at 400, Lee substantially complied with Missouri's key Rule. As to the "written motion" requirement, Missouri's brief in this Court asserted: "Nothing would have prevented counsel from drafting a brief motion and affidavit complying with Rul[e] 24.09 in longhand while seated in the courtroom."

---

demand the impossible. The witnesses' absence was unexplained, and could not be explained on the afternoon of their disappearance. That is why an overnight continuance to locate the witnesses was so "very valuable to [Lee's] case." See *supra*, at 369.

[13] Missouri cites five cases as examples of the state courts' enforcement of Rules 24.09 and 24.10 (or their predecessors) "even in cases of exigency." Brief for Respondent 25–26. The five cases are: *State* v. *Gadwood*, 342 Mo. 466, 479, 116 S. W. 2d 42, 49 (1937) (defendant's counsel knew, or should have known, of likelihood of witnesses' inability to appear two days before trial); *State* v. *Cuckovich*, 485 S. W. 2d 16, 21 (Mo. 1972) (en banc) (defendant arrived at court on first day of trial with a letter from a doctor explaining that witness was ill); *State* v. *Scott*, 487 S. W. 2d 528, 530 (Mo. 1972) (absent witness was not subpoenaed); *State* v. *Settle*, 670 S. W. 2d 7, 13–14 (Mo. App. 1984) (deficient application filed six days before trial); *State* v. *Freeman*, 702 S. W. 2d 869, 874 (Mo. App. 1985) (absent witness had told officer serving subpoena that she would not appear). All of these cases are readily distinguishable; none involved the sudden and unexplained disappearance of a subpoenaed witness in the midst of trial. The adequacy of a state ground, of course, does not depend on an appellate decision applying general rules to the precise facts of the case at bar. But here, no prior decision suggests strict application to a situation such as Lee's.

Brief for Respondent 30.[14]   At oral argument, however, Missouri's counsel edged away from this position.   Counsel stated: "I'm not going to stand on the formality . . . of a writing or even the formality of an affidavit."   Tr. of Oral Arg. 48.   This concession was well advised.   Missouri does not rule out oral continuance motions; they are expressly authorized, upon consent of the adverse party, by Rule 24.09. And the written transcript of the brief trial court proceedings, see *supra*, at 367, enabled an appellate court to comprehend the situation quickly.   In sum, we are drawn to the conclusion reached by the Eighth Circuit dissenter: "[A]ny seasoned trial lawyer would agree" that insistence on a written continuance application, supported by an affidavit, "in the midst of trial upon the discovery that subpoenaed witnesses are suddenly absent, would be so bizarre as to inject an Alice-in-Wonderland quality into the proceedings."   213 F. 3d, at 1047.

Regarding Rule 24.10, the only Rule raised on appeal by the prosecution, see *supra*, at 371–372, the Missouri Court of Appeals' decision was summary.   Although that court did not specify the particular components of the Rule neglected by Lee, the State here stresses two: "Lee's counsel never mentioned during his oral motion for continuance the testimony he expected the missing witnesses to give"; further, he "gave the trial court no reason to believe that the missing witnesses could be located within a reasonable time."   Brief for Respondent 31.

These matters, however, were either covered by the oral continuance motion or otherwise conspicuously apparent on the record.   The testimony that the alibi witnesses were expected to give had been previewed during *voir dire* at the outset of the three-day trial, then detailed in defense counsel's opening statement delivered just one day before the continuance motion.   App. 10–13; see *Osborne*, 495 U. S.,

---

[14] Missouri's brief did not address the requirement that the affidavit be notarized.

at 123 (defense counsel's failure to object to jury charge did not bar consideration of federal claim where counsel had pressed the basic objection in a motion to dismiss made immediately before "brief" trial).  Two of the prosecution's witnesses testified in part to anticipate and rebut the alibi. Tr. 443–487.  An alibi instruction was apparently taken up at the charge conference held less than an hour before the trial court denied the continuance motion.  See *supra,* at 368–369, n. 1.  When defense counsel moved for a continuance, the judge asked a question indicating his recognition that alibi witness Gladys Edwards was Lee's mother.  See *supra,* at 370, n. 2.

Given the repeated references to the anticipated alibi witness testimony each day of trial, it is inconceivable that anyone in the courtroom harbored a doubt about what the witnesses had traveled from California to Missouri to say on the stand or why their testimony was material, indeed indispensable, to the defense.  It was also evident that no witness then in the Kansas City vicinity could effectively substitute for the family members with whom Lee allegedly stayed in Ventura, California.  See Rule 24.10(a) and (c) (movant shall show "the materiality of the evidence sought," "[w]hat particular facts the affiant believes the witness will prove," and that "no other person" available to the movant could "so fully prove the same facts").

Moreover, Lee showed "reasonable grounds for belief" that the continuance would serve its purpose.  See Rule 24.10(b).  He said he knew the witnesses had not left Kansas City because they were to "ministe[r]" there the next two evenings; he provided their local address; and he sought less than a day's continuance to enforce the subpoenas for their attendance.  App. 16–18.

Concerning his "diligence . . . to obtain" the alibi testimony, see Rule 24.10(a), Lee and his counsel showed: the witnesses had voluntarily traveled from California to appear at the trial; counsel had subpoenaed the witnesses when he

interviewed them in Kansas City; the witnesses had telephoned counsel the evening before the third trial day and had agreed to come to court that next day; the witnesses in fact were in court at 8:30 in the morning waiting in a witness room; and Lee saw them during a recess. App. 16–18. Countering "procurement" of the witnesses' absence by the defense, see Rule 24.10(d), Lee affirmed that he did not know "why they left" or "where they went," and asked for just "a couple hours' continuance [to] try to locate them." App. 17–18.

Rule 24.10, like other state and federal rules of its genre, serves a governmental interest of undoubted legitimacy. It is designed to arm trial judges with the information needed to rule reliably on a motion to delay a scheduled criminal trial. The Rule's essential requirements, however, were substantially met in this case. Few transcript pages need be read to reveal the information called for by Rule 24.10. "[N]othing would [have] be[en] gained by requiring" Lee's counsel to recapitulate in (a), (b), (c), (d) order the showings the Rule requires. See *Osborne*, 495 U. S., at 124; cf. *Staub* v. *City of Baxley*, 355 U. S. 313, 319–320 (1958) (failure to challenge "specific sections" of an ordinance not an adequate state ground barring review of federal claim when party challenged constitutionality of entire ordinance and all sections were "interdependent"). "Where it is inescapable that the defendant sought to invoke the substance of his federal right, the asserted state-law defect in form must be more evident than it is here." *James* v. *Kentucky*, 466 U. S., at 351.[15]

---

[15] The dissent, indulging in hyperbole, describes our narrow opinion as a "comb" and "searc[h]" order to lower courts. *Post*, at 395. We hold, simply and only, that Lee satisfied Rule 24.10's essential elements. Just as in *Osborne*, see *supra*, at 377–378, we place no burden *on courts* to rummage through a ponderous trial transcript in search of an excuse for a defense counsel's lapse. The dissent, in this and much else, tilts at a windmill of its own invention.

The dissent critiques at great length *Henry* v. *Mississippi*, 379 U. S. 443 (1965), a case on which we do not rely in reaching our decision.[16] See *post*, at 393–395, 406. This protracted exercise is a prime example of the dissent's vigorous attack on an imaginary opinion that bears scant, if any, resemblance to the actual decision rendered today. We chart no new course. We merely apply *Osborne*'s sound reasoning and limited holding to the circumstances of this case. If the dissent's shrill prediction that today's decision will disrupt our federal system were accurate, we would have seen clear signals of such disruption in the 11 years since *Osborne*. The absence of even dim distress signals demonstrates both the tight contours of *Osborne* and the groundlessness of the dissent's frantic forecast of doom. See *United States* v. *Travers*, 514 F. 2d 1171, 1174 (CA2 1974) (Friendly, J.) ("Cassandra-like predictions in dissent are not a sure guide to the breadth of the majority's ruling").

It may be questioned, moreover, whether the dissent, put to the test, would fully embrace the unyielding theory that it is never appropriate to evaluate the state interest in a procedural rule against the circumstances of a particular

---

[16] *Henry* has been called "radical," *post*, at 393 (quoting R. Fallon, D. Meltzer, & D. Shapiro, Hart and Wechsler's The Federal Courts and the Federal System 584 (4th ed. 1996)), not for pursuing an "as applied" approach, as the dissent states, but for suggesting that the failure to comply with an anterior procedure was cured by compliance with some subsequent procedure. See *id.*, at 584–585. In *Henry*, the Court indicated that although there was no contemporaneous objection at trial to the admission of evidence alleged to have been derived from an unconstitutional search, a directed verdict motion made at the end of the prosecution's case was an adequate substitute. 379 U. S., at 448–449. Nothing of the sort is involved in this case. Lee is not endeavoring to designate some later motion, *e. g.*, one for a new trial, as an adequate substitute for a continuance motion. The question here is whether the movant must enunciate again, when making the right motion at the right time, supporting statements plainly and repeatedly made the days before. See *supra*, at 367–368. On whether such repetition serves a legitimate state interest, *Osborne*, not *Henry*, controls.

case.  See *post,* at 393–395.  If that theory holds, it would matter not at all why the witnesses left.  Even if the evidence would show beyond doubt that the witnesses left because a court functionary told them to go, saying their testimony would not be needed until the next day, see *supra,* at 373, n. 6, Lee would lose under the dissent's approach.  And that result would be unaffected should it turn out that the functionary acted on the instigation of a prosecutor who knew the judge would be at the hospital with his daughter the next day.  See *supra,* at 369.  The particular application, never mind how egregious, would be ignored so long as the Rule, like the mine run of procedural rules, generally serves a legitimate state interest.

To summarize, there was in this case no reference whatever in the trial court to Rules 24.09 and 24.10, the purported procedural impediments the Missouri Court of Appeals later pressed.  Nor is there any indication that formally perfect compliance with the Rules would have changed the trial court's decision.  Furthermore, no published Missouri decision demands unmodified application of the Rules in the urgent situation Lee's case presented.  Finally, the purpose of the Rules was served by Lee's submissions both immediately before and at the short trial.  Under the special circumstances so combined, we conclude that no adequate state-law ground hinders consideration of Lee's federal claim.[17]

Because both the District Court and the Court of Appeals held Lee's due process claim procedurally barred, neither court addressed it on the merits.  We remand the case for that purpose.  See *National Collegiate Athletic Assn.* v.

---

[17] In view of this disposition, we do not reach further questions raised by Lee, *i. e.,* whether he has shown "cause" and "prejudice" to excuse any default, *Wainwright* v. *Sykes,* 433 U. S. 72, 90–91 (1977), or has made sufficient showing of "actual innocence" under *Schlup* v. *Delo,* 513 U. S. 298, 315 (1995), to warrant a hearing of the kind ordered in that case.

*Smith,* 525 U. S. 459, 470 (1999) (We ordinarily "do not decide in the first instance issues not decided below.").

\*　　\*　　\*

For the reasons stated, the judgment of the United States Court of Appeals for the Eighth Circuit is vacated, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

JUSTICE KENNEDY, with whom JUSTICE SCALIA and JUSTICE THOMAS join, dissenting.

The Court's decision commits us to a new and, in my view, unwise course. Its contextual approach places unnecessary and unwarranted new responsibilities on state trial judges, injects troubling instability into the criminal justice system, and reaches the wrong result even under its own premises. These considerations prompt my respectful dissent.

I

The rule that an adequate state procedural ground can bar federal review of a constitutional claim has always been "about federalism," *Coleman* v. *Thompson,* 501 U. S. 722, 726 (1991), for it respects state rules of procedure while ensuring that they do not discriminate against federal rights. The doctrine originated in cases on direct review, where the existence of an independent and adequate state ground deprives this Court of jurisdiction. The rule applies with equal force, albeit for somewhat different reasons, when federal courts review the claims of state prisoners in habeas corpus proceedings, where ignoring procedural defaults would circumvent the jurisdictional limits of direct review and "undermine the State's interest in enforcing its laws." *Id.,* at 731.

Given these considerations of comity and federalism, a procedural ground will be deemed inadequate only when the

state rule "force[s] resort to an arid ritual of meaningless form." *Staub* v. *City of Baxley,* 355 U. S. 313, 320 (1958). *Staub's* formulation was imprecise, but the cases that followed clarified the two essential components of the adequate state ground inquiry: First, the defendant must have notice of the rule; and second, the State must have a legitimate interest in its enforcement.

The Court need not determine whether the requirement of Missouri Supreme Court Rule 24.09 that all continuance motions be made in writing would withstand scrutiny under the second part of this test (or, for that matter, whether Lee had cause not to comply with it, cf. *infra,* at 405). Even if it could be assumed, for the sake of argument, that Rule 24.09 would not afford defendants a fair opportunity to raise a federal claim, the same cannot be said of Rule 24.10. The latter Rule simply requires a party requesting a continuance on account of missing witnesses to explain why it is needed, and the Rule serves an undoubted and important state interest in facilitating the orderly management of trials. Other States have similar requirements. See, *e. g.,* Ind. Code § 35–36–7–1(b) (1993); La. Code Crim. Proc. Ann., Art. 709 (West 1981); Miss. Code Ann. § 99–15–29 (1972); Okla. Stat., Tit. 12, § 668 (1993); S. C. Rule Crim. Proc. 7(b) (1990); Tex. Code Crim. Proc. Ann., Art. 29.06 (Vernon 1965); Vt. Rule Crim. Proc. 50(c)(1) (1983); Wash. Rev. Code § 10.46.080 (1990). The Court's explicit deprecation of Rule 24.10—and implicit deprecation of its many counterparts—is inconsistent with the respect due to state courts and state proceedings.

## A

The initial step of the adequacy inquiry considers whether the State has put litigants on notice of the rule. The Court will disregard state procedures not firmly established and regularly followed. In *James* v. *Kentucky,* 466 U. S. 341, 346 (1984), for example, the rule was "not always clear or closely hewn to"; in *NAACP* v. *Alabama ex rel. Patterson,*

357 U. S. 449, 457 (1958), "petitioner could not fairly be deemed to have been apprised of [the rule's] existence." As the majority acknowledges, *ante,* at 367, Rule 24.10 is not in this category, for unlike the practices at issue in *James* and *Patterson,* Rule 24.10 is codified and followed in regular practice.

Several of the considerations offered in support of today's decision, however, would seem to suggest that the Court believes Rule 24.10 was not firmly established or regularly followed at the time of Lee's trial. For example, the majority cites the lack of published decisions directing flawless compliance with the Rule in the unique circumstances this case presents. *Ante,* at 382. While this description of Missouri law is dubious, see, *e. g., State* v. *Scott,* 487 S. W. 2d 528, 530 (Mo. 1972), the Court's underlying, quite novel argument ignores the nature of rulemaking. If the Court means what it says on this point, few procedural rules will give rise to an adequate state ground. Almost every case presents unique circumstances that cannot be foreseen and articulated by prior decisions, and general rules like Rule 24.10 are designed to eliminate second-guessing about the rule's applicability in special cases. Rule 24.10's plain language admits of no exception, and the Court cites no Missouri case establishing a judge-made exemption in any circumstances, much less circumstances close to these. Its applicability here was clear.

The Court also ventures into new territory by implying that the trial judge's failure to cite the Rule was meaningful, *ante,* at 366, 380, 387, and by noting that he did not give a reason for denying the continuance that could have been addressed by a motion complying with the Rule, *ante,* at 381. If these considerations were significant, however, we would have relied upon them in previous cases where the trial court's denial of the defendant's motion on the merits was affirmed by the state appellate court because of an uncited procedural defect. See, *e. g., James* v. *Kentucky,*

*supra,* at 343–344; *Staub* v. *City of Baxley, supra,* at 317–318. None of these decisions used this rationale to disregard a state procedural rule, and with good reason. To require trial judges, as a matter of federal law, to cite their precise grounds for decision would place onerous burdens on the state courts, and it is well settled that an appellate tribunal may affirm a trial court's judgment on any ground supported by the record. See *Smith* v. *Phillips,* 455 U. S. 209, 215, n. 6 (1982). Here, moreover, the uncited procedural rule was designed both to "permi[t] the trial court to pass on the merits," *State* v. *Robinson,* 864 S. W. 2d 347, 349 (Mo. App. 1993), and to facilitate the appellate court's review of asserted due process errors. Notwithstanding the Court's guess about the judge's and prosecution's inner thoughts concerning the completeness of Lee's motion, see *ante,* at 380, the Missouri Court of Appeals tells us that Lee's failure to comply with the Rule is considered consequential as a matter of state law. If Lee had complied with Rule 24.10, the trial court might have granted the continuance or given a different reason for denying it. The trial court, in effect, is deemed to have relied on Rule 24.10 when it found Lee had not made a sufficient showing.

Lee was on notice of the applicability of Rule 24.10, and the Court appears to recognize as much. The consideration most important to the Court's analysis, see *ante,* at 382, relates not to this initial question, but rather to the second part of the adequacy inquiry, which asks whether the rule serves a legitimate state interest. Here, too, in my respectful view, the Court errs.

### B

A defendant's failure to comply with a firmly established and regularly followed rule has been deemed an inadequate state ground only when the State had no legitimate interest in the rule's enforcement. *Osborne* v. *Ohio,* 495 U. S. 103, 124 (1990); *James* v. *Kentucky, supra,* at 349; *Michigan* v. *Tyler,* 436 U. S. 499, 512, n. 7 (1978). Most state pro-

cedures are supported by various legitimate interests, so established rules have been set aside only when they appeared to be calculated to discriminate against federal law, or, as one treatise puts it, they did not afford the defendant "a reasonable opportunity to assert federal rights."  16B C. Wright, A. Miller, & E. Cooper, Federal Practice and Procedure §4027, p. 392 (2d ed. 1996) (hereinafter Wright & Miller).  See, e. g., Douglas v. Alabama, 380 U. S. 415, 422–423 (1965) (rule requiring continuous repetition of identical constitutional objections); Staub v. City of Baxley, 355 U. S., at 317–318 (rule requiring defendant to challenge constitutionality of individual sections of statute); Davis v. Wechsler, 263 U. S. 22, 24 (1923) (rule waiving jurisdictional objections upon entry of appearance of federal defendant's successor-in-interest).

In light of this standard, the adequacy of Rule 24.10 has been demonstrated.  Delays in criminal trials can be "a distinct reproach to the administration of justice," Powell v. Alabama, 287 U. S. 45, 59 (1932), and States have a strong interest in ensuring that continuances are granted only when necessary.  Rule 24.10 anticipates that at certain points during a trial, important witnesses may not be available.  In these circumstances, a continuance may be appropriate if the movant makes certain required representations demonstrating good cause to believe the continuance would make a real difference to the case.

The Court acknowledges, as it must, that Rule 24.10 does not discriminate against federal law or deny defendants a reasonable opportunity to assert their rights.  Instead, the Rule "serves a governmental interest of undoubted legitimacy" in "arm[ing] trial judges with the information needed to rule reliably on a motion to delay a scheduled criminal trial."  Ante, at 385.  Nor is there any doubt Lee did not comply with the Rule, for the Missouri court's word on that state-law question is final.  See Elmendorf v. Taylor, 10 Wheat. 152, 159–160 (1825) (Marshall, C. J.).  The Court's

acceptance of these two premises should lead it to conclude that Lee's violation of the Rule was an adequate state ground for the Missouri court's decision.

Yet the Court deems Lee's default inadequate because, it says, to the extent feasible under the circumstances, he substantially complied with the Rule's essential requirements. *Ante,* at 385. These precise terms have not been used in the Court's adequacy jurisprudence before, and it is necessary to explore their implications. The argument is not that Missouri has no interest in enforcing compliance with the Rule in general, but rather that it had no interest in enforcing full compliance in this particular case. This is so, the Court holds, because the Rule's essential purposes were substantially served by other procedural devices, such as opening statement, *voir dire,* and Lee's testimony on the stand. These procedures, it is said, provided the court with the information the Rule requires the motion itself to contain. *Ante,* at 382–385. So viewed, the Court's substantial-compliance terminology begins to look more familiar: It simply paraphrases the flawed analytical approach first proposed by the Court in *Henry* v. *Mississippi,* 379 U. S. 443 (1965), but not further ratified or in fact used to set aside a procedural rule until today.

Before *Henry,* the adequacy inquiry focused on the general legitimacy of the established procedural rule, overlooking its violation only when the rule itself served no legitimate interest. See, *e. g., Douglas* v. *Alabama, supra,* at 422–423; *Davis* v. *Wechsler, supra,* at 24. *Henry* was troubling, and much criticized, because it injected an as-applied factor into the equation. See, *e. g.,* R. Fallon, D. Meltzer, & D. Shapiro, Hart and Wechsler's The Federal Courts and the Federal System 584 (4th ed. 1996) (hereinafter Hart & Wechsler) (calling this element of *Henry* "radical"); 16B Wright & Miller § 4028, at 394 (arguing that *Henry*'s approach—under which "state procedural rules may accomplish forfeiture only if necessary to further a legitimate state interest in the

actual circumstances of application to the very case before the court"—"unduly subordinates state interests"); cf. *ante,* at 376 ("There are . . . exceptional cases in which exorbitant application of a generally sound rule renders the state ground inadequate"). The petitioner in *Henry* had defaulted his Fourth Amendment claim in state court by failing to lodge a contemporaneous objection to the admission of the contested evidence. Despite conceding the legitimate state interest in enforcing this common rule, the Court vacated the state-court judgment, proposing that the default may have been inadequate because the rule's "purpose . . . may have been substantially served by petitioner's motion at the close of the State's evidence asking for a directed verdict." *Henry* v. *Mississippi, supra,* at 448. The suggestion, then, was that a violation of a rule serving a legitimate state interest may be ignored when, in the peculiar circumstances of a given case, the defendant utilized some other procedure serving the same interest.

For all *Henry* possessed in mischievous potential, however, it lacked significant precedential effect. *Henry* itself did not hold the asserted state ground inadequate; instead it remanded for the state court to determine whether "petitioner's counsel deliberately bypassed the opportunity to make timely objection in the state court." 379 U. S., at 449–453. The cornerstone of that analysis, the deliberate-bypass standard of *Fay* v. *Noia,* 372 U. S. 391, 426–434 (1963), later was limited to its facts in *Wainwright* v. *Sykes,* 433 U. S. 72, 87–88 (1977), and then put to rest in *Coleman* v. *Thompson,* 501 U. S., at 750. Subsequent cases maintained the pre-*Henry* focus on the general validity of the challenged state practice, either declining to cite *Henry* or framing its holding in innocuous terms. See, *e. g., James* v. *Kentucky,* 466 U. S., at 349; *Monger* v. *Florida,* 405 U. S. 958 (1972); see also Hart & Wechsler 585–586 (describing the "[d]emise of *Henry*"); 16B Wright & Miller § 4020, at 291 ("Later decisions, over a period now measured in decades,

are more remarkable for frequently omitting any reference to the Henry decision than for clarifying it").

There is no meaningful distinction between the *Henry* Court's analysis and the standard the Court applies today, and this surprising reinvigoration of the case-by-case approach is contrary to the principles of federalism underlying our habeas corpus jurisprudence. Procedural rules, like the substantive laws they implement, are the products of sovereignty and democratic processes. The States have weighty interests in enforcing rules that protect the integrity and uniformity of trials, even when "the reason for a rule does not clearly apply." *Staub* v. *City of Baxley*, 355 U. S., at 333 (Frankfurter, J., dissenting). Regardless of the particular facts in extraordinary cases, then, Missouri has a freestanding interest in Rule 24.10 as a rule.

By ignoring that interest, the majority's approach invites much mischief at criminal trials, and the burden imposed upon States and their courts will be heavy. All requirements of a rule are, in the rulemaker's view, essential to fulfill its purposes; imperfect compliance is thus, by definition, not compliance at all. Yet the State's sound judgment on these matters can now be overridden by a federal court, which may determine for itself, given its own understanding of the rule's purposes, whether a requirement was essential or compliance was substantial in the unique circumstances of any given case. Henceforth, each time a litigant does not comply with an established state procedure, the judge must inquire, even "in the midst of trial, . . . whether noncompliance should be excused because some alternative procedure might be deemed adequate in the particular situation." Hart & Wechsler 585. The trial courts, then the state appellate courts, and, in the end, the federal habeas courts in numerous instances must comb through the full transcript and trial record, searching for ways in which the defendant might have substantially complied with the essential requirements of an otherwise broken rule.

The Court seeks to ground its renewal of *Henry*'s long-quiescent dictum in our more recent decision in *Osborne* v. *Ohio*, 495 U. S., at 122–125. Though isolated statements in *Osborne* might appear to support the majority's approach—or, for that matter, *Henry*'s approach—*Osborne*'s holding does not.

This case bears little resemblance, if any, to *Osborne*. The Ohio statute in question there made it criminal to possess a photograph of a minor in "a state of nudity." Ohio Rev. Code Ann. § 2907.323(A)(3) (Supp. 1989). In a pretrial motion to dismiss, Osborne objected to the statute as overbroad under the First Amendment. The state trial court denied the motion, allowed the case to proceed, and adopted no limiting construction of the statute when it instructed the jury on the elements of the crime.

In his appeal to the Ohio Supreme Court, Osborne argued that the statute violated the First Amendment for two reasons: First, it prohibited the possession of nonlewd material; and second, it lacked a scienter requirement. In rejecting the first contention, the appellate court did what the trial court had not: It adopted a limiting construction so that "nudity constitute[d] a lewd exhibition or involve[d] a graphic focus on the genitals." *State* v. *Young*, 37 Ohio St. 3d 249, 252, 525 N. E. 2d 1363, 1368 (1988). In addressing Osborne's second point, the Ohio Supreme Court noted that another Ohio statute provided a *mens rea* of recklessness whenever, as was the case there, the criminal statute at issue was silent on the question. *Id.*, at 252–253, 525 N. E. 2d, at 1368 (citing Ohio Rev. Code Ann. § 2901.21(B) (1987)). Osborne also argued that his due process rights were violated because the trial court had not instructed the jury on the elements of lewdness and recklessness that the Ohio Supreme Court had just read into the statute. The appellate court rejected this claim on procedural grounds, observing that Osborne "neither requested such . . . charge[s] nor objected to the instructions as given." 37 Ohio St. 3d, at 254, 258,

525 N. E. 2d, at 1369, 1373 (citing Ohio Rule Crim. Proc. 30(A) (1989)).

When Osborne's case reached this Court, the parties' due process discussion focused on the merits, not the procedural bar. "It is a violation of due process," Osborne's brief argued, "where . . . a state supreme court adds new elements to save a statute and then affirms the conviction." Brief for Appellant, O. T. 1989, No. 88–5986, p. 25. Ohio's response, contending that the appellate court's limiting construction was "foreseeable," mentioned the procedural rule in a short, conclusory paragraph. Brief for Appellee, O. T. 1989, No. 88–5986, pp. 43–44. Against this backdrop, we decided the asserted procedural ground was adequate to block our assessment of the scienter claim but not the lewdness claim. *Osborne* v. *Ohio, supra,* at 125–126. This was not the watershed holding today's majority makes it out to be. The procedure invoked by the State with respect to lewdness required defendants in all overbreadth cases to take one of two steps, neither of which comported with established adequacy principles.

First, Ohio's primary contention was, as we noted, "that counsel should . . . have insisted that the court instruct the jury on lewdness" by proposing an instruction mirroring the unforeseeable limiting construction the Ohio Supreme Court would later devise. 495 U. S., at 124. To the extent the State required defendants to exhibit this sort of prescience, it placed a clear and unreasonable burden upon their due process rights. *Shuttlesworth* v. *Birmingham,* 394 U. S. 147, 155–157 (1969); see also *Osborne* v. *Ohio, supra,* at 118 ("[W]here a State Supreme Court narrows an unconstitutionally overbroad statute, the State must ensure that defendants are convicted under the statute as it is subsequently construed and not as it was originally written"). Osborne might, for example, have guessed "obscenity" rather than mere "lewdness," or "focus on the genitals" without the additional "lewdness" option; yet according to the State,

neither proposed instruction would have preserved his federal claim. That our decision was based on this foreseeability concern is evident from our discussion of the state court's treatment of the scienter question. This holding was supported by an adequate state ground, we found, because the state statute cited by the Ohio Supreme Court "state[d] that proof of scienter is required in instances, like the present one, where a criminal statute does not specify the applicable mental state." 495 U. S., at 123. In other words, while the recklessness element was foreseeable (and in fact established by statute), the lewdness element was not.

Second, to the extent Ohio faulted the defendant for not raising a more general objection to the jury instructions, *Osborne* followed from *Douglas* v. *Alabama,* 380 U. S., at 420–423. In *Douglas,* the defendant was required to repeat, again and again, the same Confrontation Clause objection while his codefendant's confession was read to the jury. The trial court's initial adverse ruling foreclosed the possibility that the subsequent objections would be sustained. Ohio's treatment of overbreadth objections raised similar concerns. By ruling on and rejecting the pretrial objection—at the time when overbreadth challenges are generally made—the trial court would make its position on lewdness clear. The case would continue on the assumption that the statute was not overbroad and that possession of nonlewd materials could be a criminal offense. Any evidence the defendant introduced to establish that the photographs were not lewd would be irrelevant, and likely objectionable on this ground. As both a logical and a practical matter, then, the ruling at the trial's outset would foreclose a lewdness instruction at the trial's close. Ohio's requirement that the defendant nonetheless make some sort of objection to the jury instructions, as we concluded, served "no perceivable state interest." 495 U. S., at 124 (internal quotation marks omitted). On this point, too, the *Osborne* Court's different conclusion with respect to scienter is enlightening. Osborne did not

argue in an appropriate pretrial motion that the other Ohio statute supplied the recklessness element, so no ruling precluded him from admitting evidence on *mens rea* or requesting a recklessness instruction.

*Osborne* thus stands for the proposition that once a trial court rejects an overbreadth challenge, the defendant cannot be expected to predict an unforeseeable limiting construction later adopted by the state appellate court or to lodge a foreclosed objection to the jury instructions. That holding, of course, has no relevance to the case at hand. Rule 24.10 does not require defendants to foresee the unforeseeable, and no previous ruling precluded the trial court from granting Lee's continuance motion. And though the *Osborne* Court's analysis was tailored to First Amendment overbreadth concerns, it did not adopt the majority's fact-specific approach. *Osborne*'s rationale would apply to all overbreadth cases without regard to whether their facts were unique or their circumstances were extraordinary. The majority's suggestion to the contrary exaggerates the importance of certain language employed by the *Osborne* Court. We did take note of the "sequence of events," *id.*, at 124, but only because in all overbreadth cases, Ohio procedure mandated a sequence whereby defendants were required to predict unforeseeable limiting constructions before they were adopted or to lodge objections foreclosed by previous rulings. We also mentioned the trial's brevity, *id.*, at 123–124, but that fleeting reference was not only unnecessary but also in tension with the *Osborne* Court's analysis. The adequacy doctrine would have dictated the same result, brief trial or no.

The *Osborne* decision did not lay the groundwork for today's revival of *Henry* v. *Mississippi*. Yet even if it made sense to consider the adequacy of state rules on a case-by-case basis, the Court would be wrong to conclude that enforcement of Rule 24.10 would serve no purpose in this case. Erroneous disregard of state procedural rules will be common under the regime endorsed by the Court today, for its

basic assumption—that the purposes of a particular state procedure can be served by use of a rather different one— ignores the realities of trial. The Court here sweeps aside as unnecessary a rule that would have produced the very predicate the trial court needed to grant the motion: an assurance that the defense witnesses were still prepared to offer material testimony.

The majority contends that Lee compensated for any inadequacies in his motion, even if through inadvertence, by various remarks and observations made during earlier parts of the trial. To reach this conclusion, the Court must construe counsel's statements with a pronounced liberality. Even if we could assume, however, that Lee and his lawyer provided all the required information at some point, we could not conclude that "th[e] purpose of the . . . rule" was "substantially served," *Henry* v. *Mississippi*, 379 U. S., at 448, or, in the terms used by today's majority, that "[t]he Rule's essential requirements . . . were substantially met," *ante*, at 385. The most critical information the Rule requires— "What particular facts the affiant believes the witness will prove"—was revealed not at the time of the motion, but at earlier stages: *voir dire*, opening statements, and perhaps, the majority speculates, the charge conference. *Ante*, at 383–384. To say the essential requirements of Rule 24.10 were met, then, is to assume the requirement that representations be made at the time of the motion is not central to the Rule or its objectives.

This assumption ignores the State's interest in placing all relevant information before the trial court when the motion is made, rather than asking the judge to rely upon his or her memory of earlier statements. Cf. *Ungar* v. *Sarafite*, 376 U. S. 575, 589 (1964) (test for determining whether denial of continuance violated due process considers "particularly . . . the reasons presented to the trial judge at the time the request is denied"). The assumption looks past the State's

corresponding interest in facilitating appellate review by placing all information relevant to the continuance motion in a single place in the record. The assumption also ignores the plain fact that the posture of this case was far different when Lee made his continuance motion than it was at the outset of the trial. Even if the judge recalled the precise details of *voir dire* and opening statements (as the majority believes, see *ante,* at 384), the State's interest in requiring Lee to make the representations after the prosecution rested was no less pronounced.

As the very existence of rules like Rule 24.10 indicates, seasoned trial judges are likely to look upon continuance motions based on the absence of witnesses with a considerable degree of skepticism. This case was no different, for the trial judge suspected that the witnesses had abandoned Lee. The majority is simply wrong to suggest that no one in the courtroom harbored a doubt about what Lee's family members would have said if they had returned. See *ibid.* On the contrary, in light of the witnesses' sudden disappearance, it is more likely that no one in the courtroom would have had any idea what to expect.

The Court fails to recognize that the trial judge was quite capable of distinguishing between counsel's brave promises to the jury at various stages of the trial and what counsel could in fact deliver when the continuance was sought. There is nothing unusual about lawyers using hyperbole in statements to the jury but then using careful and documented arguments when making representations to the court in support of requests for specific rulings. Trial judges must distinguish between the two on a daily basis. In closing argument, for example, defense counsel told the jury:

> "I'm an old man, been in this business 43 years, seen a little of criminal cases. Never seen one as weak as this." Tr. 618.

Quite aside from the prosecutor's predictable response—"He said that in the last case I tried with him too," *id.*, at 620— the rhetoric was an ill fit with the routine, mechanical way defense counsel presented his motion for acquittal, with the jury absent, at the close of the prosecution's case. He gave not one specific reason to grant the motion, his complete argument consisting of the following:

> "MR. McMULLIN: I'll file it. I left it in the office. There's nothing exceptional in it. The defendant—that we move for judgment of acquittal for the reason that the State's evidence is insufficient as a matter of law to sustain a conviction and that should be easily disposed of." *Id.*, at 489.

These are the customary dynamics of trial, perhaps; but the whole course of these proceedings served to confirm what the trial judge told counsel at the outset of the case: "I don't have a lot of faith in what's said in opening statement." *Id.*, at 173. Opening statements can be imprecise, and are sometimes designed to force the opposition's hand or shape the jurors' perception of events. When the time came for presentation of the defense case, counsel faced significant obstacles in establishing the alibi he had promised before. Indeed, it is a fair inference to say the alibi defense had collapsed altogether. Two witnesses with no connection to the defendants or the crime identified Lee as the driver of the automobile used by the passenger-gunman. Any thought that difficulties with these eyewitnesses' identification might give Lee room to present his alibi defense was dispelled by two additional witnesses for the prosecution. Both had known Lee for a considerable period of time, so the chances of mistaken identity were minimal. Both saw him in Kansas City—not in California—on the night before the murder. He was not only in town, they testified, but also with the shooter and looking for the victim.

Faced with this and other evidence adduced by the prosecution, defense counsel elected to open not with the alibi witnesses whose testimony was supposed to be so critical, but rather with two witnesses who attempted to refute a collateral aspect of the testimony given by one of the prosecution's eyewitnesses. Only then did the defense call the alibi witnesses, who were to testify that Lee went to California to attend a birthday party in July 1992 and did not return to Kansas City until October. At this point the case was far different from what defense counsel might have hoped for at the opening.

When Lee's witnesses were then reported missing, the judge had ample reason to believe they had second thoughts about testifying. All three of Lee's family members had traveled from California to testify, but all three left without speaking to Lee or his lawyer. Two sets of witnesses, four persons in all, had just placed Lee in Kansas City; and the prosecution had said it had in reserve other witnesses prepared to rebut the alibi testimony. Lee had been sentenced to 80 years in Missouri prison for an unrelated armed assault and robbery, and any witness who was considering perjury would have had little inducement to take that risk—a risk that would have became more pronounced after the prosecution's witnesses had testified—if Lee would serve a long prison term in any event. The judge's skepticism seems even more justified when it is noted that six weeks later, during a hearing on Lee's motion for a new trial, counsel still did not explain where Lee's family members had gone or why they had left. It was not until 17 months later, in an amended motion for postconviction relief, that Lee first gave the Missouri courts an explanation for his family's disappearance.

Before any careful trial judge granted a continuance in these circumstances, he or she would want a representation that the movant believed the missing witnesses were still prepared to offer the alibi testimony. Cf. *Avery* v. *Ala-*

*bama,* 308 U. S. 444, 446 (1940) (propriety of continuance, for the purposes of the Fourteenth Amendment, must be "decided by the trial judge in the light of facts then presented and conditions then existing"). If Lee and his counsel had any reason to believe his witnesses had not abandoned him, this representation would not have been difficult to make, and the trial judge would have had reason to credit it. Yet defense counsel was careful at all stages to avoid making this precise representation. In his opening statement he said:

> "We will put on three witnesses for the defense, and you will see them and be able to evaluate them and see whether or not they're liars or not. You can determine for yourself." App. 12.

When he moved for the continuance, Lee's counsel, consistent with his guarded approach, would not say the witnesses would still testify as advertised:

> "THE COURT: The folks were here today. They were seen here on this floor of the courthouse, and they apparently simply have abandoned—
> MR. McMULLIN: Well—
> THE COURT:—the defendant in—although they're family, despite the fact that they're under subpoena.
> MR. McMULLIN: It looks like that, Judge. I don't know. I would—I can neither confirm nor deny." *Id.,* at 22.

No one—not Lee, not his attorney—stood before the court and expressed a belief, as required by Rule 24.10, that the missing witnesses would still testify that Lee had been in California on the night of the murder. Without that assurance, the judge had little reason to believe the continuance would be of any use. In concluding that the purposes of Rule 24.10 were served by promises made in an opening statement, the majority has ignored one of the central purposes of the Rule.

In sum, Rule 24.10 served legitimate state interests, both as a general matter and as applied to the facts of this case. Lee's failure to comply was an adequate state ground, and the Court's contrary determination does not bode well for the adequacy doctrine or federalism.

## II

A federal court could consider the merits of Lee's defaulted federal claim if he had shown cause for the default and prejudice therefrom, see *Wainwright* v. *Sykes*, 433 U. S., at 90–91, or made out a compelling case of actual innocence, see *Schlup* v. *Delo*, 513 U. S. 298, 314–315 (1995). He has done neither.

As to the first question, Lee says the sudden disappearance of his witnesses caused him to neglect Rule 24.10. In one sense, of course, he is right, for he would not have requested the continuance, much less failed to comply with Rule 24.10, if his witnesses had not left the courthouse. The argument, though, is unavailing. The cause component of the cause-and-prejudice analysis requires more than a but-for causal relationship between the cause and the default. Lee must also show, given the state of the trial when the motion was made, that an external factor "impeded counsel's efforts to comply with the State's procedural rule." *Murray* v. *Carrier*, 477 U. S. 478, 488 (1986). While the departure of his key witnesses may have taken him by surprise (and caused him not to comply with Rule 24.09's writing requirement), nothing about their quick exit stopped him from making a complete oral motion and explaining their absence, the substance of their anticipated testimony, and its materiality.

Nor has Lee shown that an evidentiary hearing is needed to determine whether "a constitutional violation has probably resulted in the conviction of one who is actually innocent." *Id.*, at 496. To fall within this "narrow class of cases," *McCleskey* v. *Zant*, 499 U. S. 467, 494 (1991), Lee

must demonstrate "that it is more likely than not that no reasonable juror would have convicted him in the light of the new evidence." *Schlup* v. *Delo, supra,* at 327, 314–315. Lee would offer the testimony of his mother, stepfather, and sister; but to this day, almost eight years after the trial, Lee has not produced a shred of tangible evidence corroborating their story that he had flown to California to attend a 4-month long birthday party at the time of the murder. To acquit, the jury would have to overlook this problem, ignore the relatives' motive to concoct an alibi for their kin, and discount the prosecution's four eyewitnesses. Even with the relatives' testimony, a reasonable juror could vote to convict.

\* \* \*

"Flying banners of federalism, the Court's opinion actually raises storm signals of a most disquieting nature." So wrote Justice Harlan, dissenting in *Henry* v. *Mississippi,* 379 U. S., at 457. The disruption he predicted failed to spread, not because *Henry*'s approach was sound but because in later cases the Court, heeding his admonition, refrained from following the course *Henry* prescribed. Though the Court disclaims reliance upon *Henry,* it has in fact revived that case's discredited rationale. Serious doubt is now cast upon many state procedural rules and the convictions sustained under them.

Sound principles of federalism counsel against this result. I would affirm the judgment of the Court of Appeals.