FILED
United States Court of Appeals
Tenth Circuit

May 25, 2010

Elisabeth A. Shumaker
Clerk of Court

PUBLISH

UNITED STATES COURT OF APPEALS

TENTH CIRCUIT

MICHAEL BUNTON,

      Petitioner-Appellant,

v.

EUGENE ATHERTON; ATTORNEY
GENERAL OF THE STATE OF
COLORADO,

      Respondents-Appellees.

No. 09-1152

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
(D.C. No. 1:99-CV-02152-REB-KLM)

Howard Pincus, Assistant Federal Public Defender, (Raymond P. Moore, Federal
Public Defender, with him on the briefs), Denver, Colorado, for Petitioner-
Appellant.

Katherine A. Hansen, Senior Assistant Attorney General, (John W. Suthers,
Attorney General, with her on the brief), Criminal Justice Section, Appellate
Division, Denver, Colorado, for Respondents-Appellees.

Before **BRISCOE,** Chief Judge, **HAWKINS,**[*] and **O'BRIEN**, Circuit Judges.

**BRISCOE**, Chief Judge.

---

[*] The Honorable Michael D. Hawkins, Senior Circuit Judge, Ninth Circuit
Court of Appeals, sitting by designation.

Petitioner Michael Bunton, a Colorado state prisoner convicted of first degree murder and sentenced to life in prison, appeals the district court's denial of his 28 U.S.C. § 2254 petition for federal habeas relief. Exercising jurisdiction pursuant to 28 U.S.C. § 1291, we affirm.

I

*Factual background*

At approximately 11:15 p.m. on April 7, 1986, in a crime-ridden neighborhood of Denver known as "Five Points," an individual named Jesse Harrington was shot once in the head at close range with a large caliber weapon. After Harrington fell to the ground, he was dragged to a nearby parking lot and placed behind a trash dumpster. The police were eventually alerted to the crime and reported to the scene. Although Harrington was still alive but unconscious when discovered by the police, he died shortly thereafter.

The ensuing police investigation produced evidence implicating Bunton in the crime. A witness named Darrell White, who was working as a bouncer and doorman at a nearby nightclub called Ladies Choice on the night of the shooting, told police that he had gone outside to his car, which was parked on the west side of Welton Street near the club[1], to listen to music and smoke a joint. As he was

---

[1] Ladies Choice was located on Welton Street between 25th and 26th Streets. At that time, Welton Street, at least the portion where Ladies Choice was

(continued...)

2

sitting in his car, White told the police, he observed a man, later identified as Bunton, leave the club, walk north on the sidewalk towards the corner of Welton and 26th Streets, and round the corner onto the sidewalk of 26th Street heading west. Shortly thereafter, according to White, Harrington and another man, later identified as Tyrone Speer, left the club together and met up with Bunton. White told the police that the three men appeared to engage in an argument, at the conclusion of which Bunton reached into his pants, pulled out a large caliber revolver, and shot Harrington in the face. After Harrington fell to the ground, White told the police, Bunton walked back east to the corner of Welton and 26th Streets, looked up and down Welton Street, and then walked back to where Harrington was laying on the sidewalk. According to White, Bunton and Speer then appeared to drag Harrington by his feet behind a building into a parking lot. Bunton and Speer then reappeared, according to White, and returned to the club.

Carrie Bolling, another witness who lived in a nearby apartment located on 26th Street near the corner of Welton Street, told the police that on the evening of the shooting, she went to bed at approximately 10:30 p.m. and was later awakened by a loud noise. According to Bolling, she scooted to the edge of her bed, looked out the window, and observed a man laying on the ground and a crowd of people standing on a nearby corner. Bolling told the police that two men walked from

_____

[1](...continued)
located, was a multi-lane one-way street that offered parallel parking spots on either side.

3

the crowd toward the man on the ground, who she thought was simply drunk, grabbed his feet and started dragging him toward the back of a nearby parking lot. Bolling indicated that the three men disappeared behind a building for a short time, and then the two men who had dragged the man on the ground reappeared.

Both White and Bolling told police that they had seen Bunton and Speer before in Ladies Choice (although neither White nor Bolling knew the men's names), and both White and Bolling identified Bunton and Speer in separate photo lineups. Further, White indicated that Bunton, at the time of the incident, was wearing a distinctive fringed jacket.[2]

Bunton was initially questioned by police on April 15, 1986. At that time, Bunton denied any knowledge of the shooting, stated he did not know who Harrington was, and indicated he had not been to the neighborhood in which the murder occurred for at least four or five months. A week after his interview, on April 22, 1986, Bunton was arrested in connection with the murder.

*The state court criminal proceedings*

On April 25, 1986, a criminal complaint was filed against Bunton in Colorado state court charging him with first degree murder. A public defender

---

[2] A third witness, Johnny Blackwell, told police he was present when Harrington was shot, and he identified Bunton as the person responsible for the shooting. At trial, however, Blackwell, who was then serving time in prison, denied any knowledge of the shooting.

Tyrone Speer, the second man identified by both White and Bolling, similarly implicated Bunton as the shooter during a videotaped interview with police. Speer was not, however, called as a witness at Bunton's trial.

4

was initially appointed to represent Bunton, but, apparently due to a conflict of interest, subsequently withdrew from that representation. The state district court then appointed private counsel, Keith Johnson, to represent Bunton at trial.

The case proceeded to trial on November 18, 1986. On November 21, 1986, at the conclusion of the prosecution's evidence (Bunton neither testified nor presented any witnesses of his own), the jury found Bunton guilty of first degree murder. On January 6, 1987, the state district court sentenced Bunton to life imprisonment in the custody of the Colorado Department of Corrections.

Bunton filed a direct appeal challenging his conviction on two grounds: (1) prosecutorial misconduct during closing arguments; and (2) the trial court's refusal to instruct the jury on the lesser offense of second degree murder. On October 25, 1990, the Colorado Court of Appeals (CCA) issued an unpublished order affirming Bunton's conviction. State v. Bunton, No. 88CA1471 (Colo. Ct. App. Oct. 25, 1990) (Bunton I). Bunton filed a petition for writ of certiorari with the Colorado Supreme Court. The Colorado Supreme Court denied the petition on March 25, 1991.

*The state postconviction proceedings*

On December 1, 1988, while his direct appeal was still pending, Bunton filed a pro se motion seeking the appointment of counsel so that he could pursue state postconviction relief pursuant to Colo. R. Crim. P. 35(c). On January 17, 1989, the state district court granted Bunton's motion and appointed private

5

counsel to represent Bunton. On March 9, 1989, prior to the CCA's decision affirming Bunton's conviction on direct appeal, Bunton's appointed counsel filed a motion for postconviction relief alleging that Bunton's trial counsel was ineffective in several respects. On May 5, 1989, Bunton filed a pro se petition for state postconviction relief alleging, in pertinent part, that his trial counsel "failed to effectively and competently afford [Bunton] effective representation." State ROA, Vol. 2 at 14. An additional brief in support of the postconviction motions, prepared by Bunton's appointed counsel, was filed on March 10, 1997.

On September 5, 1997, the state district court concluded that Bunton was "indigent and entitled to representation by the Public Defenders Office," and that "no conflict exist[ed]." Id. at 125. Accordingly, the state district court vacated the appointment of private counsel and appointed the Public Defender to represent Bunton in the proceedings on his petition for state postconviction relief.

On August 11-12, 1997, the state district court held an evidentiary hearing on Bunton's Rule 35(c) motion. During the hearing, Bunton presented testimony from five witnesses, including Johnson, his trial counsel. On August 25, 1997, the state district court held another hearing, during which it orally denied Bunton's Rule 35(c) motion. In doing so, the state district court noted it had "reviewed the transcript of the trial and . . . f[ou]nd nothing deficient in [Johnson's] performance . . . ." Id., Vol. 12 at 4. More specifically, the state district court noted that "Johnson had a bit of an uphill battle on his hands" in

6

defending Bunton, id., and it stated that, even if "Johnson [had] done all the things that current counsel suggests he should have done," it was "not the least bit convinced that the outcome [of the trial] would have been a single bit different," id. at 8. Citing Strickland v. Washington, 466 U.S. 668 (1984), the state district court concluded that "Johnson's performance [did not] f[a]ll below the standard of practice in the community," and that, even assuming otherwise, "the outcome of the case would [not] have been in any way changed by" the actions suggested by Bunton in his Rule 35(c) motion. State ROA, Vol. 12 at 8.

Bunton appealed the denial of his Rule 35(c) motion. On December 3, 1998, the CCA issued an unpublished decision affirming the denial of postconviction relief. State v. Bunton, No. 97CA1776 (Colo. Ct. App. Dec. 3, 1998) (Bunton II). On May 10, 1999, the Colorado Supreme Court denied Bunton's petition for writ of certiorari.

*The federal habeas proceedings*

Bunton initiated these federal habeas proceedings on November 1, 1999, by filing in federal district court pro se motions to proceed in forma pauperis and for appointment of counsel. On November 5, 1999, Bunton filed a pro se application for writ of habeas corpus pursuant to 28 U.S.C. § 2254. Bunton's pro se application alleged, in pertinent part, that his trial counsel "failed to adequately prepare [for] trial," and trial "counsel's trial presentation was inadequate." ROA, Vol. 1, Doc. 5 at 6.

7

Respondents filed an answer addressing, in detail, each of Bunton's claims and urging that Bunton's application be denied in its entirety. On April 12, 2001, the magistrate judge issued a written recommendation addressing each of Bunton's claims and recommending that Bunton's application for federal habeas relief be denied.

Bunton filed written objections to the magistrate judge's recommendation. In those objections, Bunton alleged that he was dyslexic and needed counsel to assist him. On June 15, 2001, the district court appointed the federal public defender to represent Bunton.

Bunton's appointed counsel subsequently sought and was granted two stays in order to investigate the case and to file any additional pleadings on Bunton's behalf. On November 26, 2003, Bunton's appointed counsel filed a supplemental pleading in support of Bunton's previously filed objections to the magistrate judge's recommendation. On that same date, Bunton's appointed counsel also filed a motion for evidentiary hearing on the issue of whether any procedural default should be excused because Bunton was actually innocent. Respondents filed a pleading in opposition to Bunton's motion for evidentiary hearing.

On March 6, 2009, the district court issued an order denying both Bunton's motion for an evidentiary hearing and Bunton's application for federal habeas relief. Judgment was entered on March 12, 2009.

Bunton filed a notice of appeal on April 13, 2009. On April 21, 2009, the

district court denied Bunton a certificate of appealability (COA). On January 7, 2010, this court granted Bunton a COA on two claims of ineffective assistance of trial counsel.

## II

### *Standard of review*

Our review of Bunton's ineffective assistance of counsel claims is governed by the provisions of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA). Snow v. Sirmons, 474 F.3d 693, 696 (10th Cir. 2007). Under AEDPA, the standard of review applicable to a particular claim depends upon how that claim was resolved by the state courts. Id.

As discussed in greater detail below, the first claim asserted by Bunton in this appeal was addressed on the merits by the CCA in Bunton's state postconviction proceedings (i.e., the Rule 35(c) proceedings). Accordingly, we may not grant federal habeas relief on the basis of that claim unless the CCA's decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1), or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," id. § 2254(d)(2). "When reviewing a state court's application of federal law, we are precluded from issuing the writ simply because we conclude in our independent judgment that the state court applied the law erroneously or incorrectly."

9

McLuckie v. Abbott, 337 F.3d 1193, 1197 (10th Cir. 2003). "Rather, we must be convinced that the application was also objectively unreasonable." Id. "This standard does not require our abject deference, but nonetheless prohibits us from substituting our own judgment for that of the state court." Snow, 474 F.3d at 696 (internal citation and quotation marks omitted).

The second claim asserted by Bunton in this appeal was denied by the CCA as procedurally barred due to Bunton's failure to include a key trial exhibit in the record on appeal from the denial of his postconviction Rule 35(c) motion. As discussed in greater detail below, we must first determine whether to apply the independent and adequate state procedural ground doctrine. Only if we conclude the doctrine does not apply may we proceed to the merits of the claim.

### *Strickland* standards

To prevail on a claim of ineffective assistance of counsel, a criminal defendant has the burden of showing by a preponderance of the evidence that counsel's performance fell below an objective standard of reasonableness, Strickland, 466 U.S. at 688, and "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," id. at 694.

### *Trial counsel's failure to call Grace Marie Bursie as a defense witness*

In his first claim on appeal, Bunton contends his trial counsel was ineffective for failing to call as a witness at trial Grace Marie Bursie, his

10

girlfriend at the time of the shooting. According to Bunton, the prosecution's only purported eyewitness to the shooting, Darrell White, was romantically interested in Bursie, sufficiently so that he was motivated to falsely implicate Bunton as the person responsible for the shooting. Bunton further argues that, had his trial counsel presented Bursie as a witness at trial, her testimony would have sufficiently undermined White's credibility so as to result in a different verdict.

*a) The relevant trial proceedings*

It is undisputed that when Bunton's trial counsel gave his opening statement, he suggested that one of the prosecution's witnesses might be testifying as a result of improper motives. State ROA, Vol. 10 at 33-34 (testimony of Bunton's trial counsel at Rule 35(c) postconviction hearing). Because, however, the opening statements were not transcribed, it is unclear precisely how Bunton's trial counsel framed this suggestion. In particular, it is unclear whether Bunton's trial counsel specifically indicated that it was White who might be testifying as a result of an improper motive, and it is likewise unclear whether Bunton's trial counsel identified the nature of the improper motivation.

In any event, during the direct examination of White, the prosecutor asked White if he knew Bursie. State ROA, Vol. 5 at 118 ("How about a young lady by the name of Grace Marie?"). White stated that he knew her because "[s]he used

11

to come to the club [i.e., Ladies Choice]" with Bunton.  Id.  When asked by the prosecutor if he knew "of any relationship that existed between . . . Bunton" and Bursie, White stated: "I believe they were seeing each other."  Id. at 119.  The prosecutor then asked White whether "at any time [he] attempt[ed] to interfere" with that relationship or "ever attempt[ed] to go out with" Bursie, to which White responded "No."[3]  Id.

On cross-examination, Bunton's trial counsel asked White the following series of questions regarding Bursie:

Q.  You mentioned when you were asked if you knew a person by the name of Grace Marie, and you said you did; is that correct?

A.  Yes.

Q.  Isn't it true that you know her through Johnny Ray Blackwell?

A.  No.

Q.  How did you meet?

A.  I met Grace, she was down there – there is a little guy named Al. He's the DJ, and I met her as she was going in and out the club [i.e., Ladies Choice].

Q.  Were you friends?

A.  Yes.

Q.  Take sort of a big brother-sister attitude with her?

A.  Yes.

_____

[3] At trial, White indicated he was married.  However, other parts of the record indicate he merely had a girlfriend with whom he was living.

12

Q. Tried to help her out?

A. Yes.

Q. Did she ever come to you with problems and ask for advice?

A. Yes.

Q. Do you remember her giving you a call after the incident and wanting to talk to you about a line of clothes she was designing?

A. Yes.

Q. Wanted you to kind of help her out and fund it maybe; is that right?

A. Yes.

Q. Do you remember cutting in on her and saying: What do you think about your boy now?

A. No.

Q. Do you remember her as somebody who had dated in the past Michael Bunton?

A. Yes.

Q. But you didn't say to her: What do you think about your boy now?

A. No.

Q. You didn't tell her that you had seen him arrested that day on a murder charge?

A. No.

Q. You didn't tell her: I told you this was going to happen?

A. No.

13

Q. Prior to the phone call, had you ever told her: Listen, you shouldn't be hanging out with Michael Bunton? Excuse me, I will wait for the siren.

THE COURT: Wait for the siren.

Q. (By Mr. Johnson) Do you recall telling Grace Marie prior to this phone conversation that you shouldn't be with Michael Bunton?

A. (By the Witness) No.

Q. That I can do more for you? He can't do anything for you?

A. No.

Q. You should be mine?

A. No.

Q. No? Never? And if she came in and said that, she would be lying?

A. She would be lying.

Id. at 179-181.

On redirect, the prosecutor asked White, "Now, doesn't this entire idea of you putting a man behind a murder charge for a woman seem a little absurd to you?" Id. at 187. White responded, "Yes." Id.

At the conclusion of the prosecution's evidence, Bunton's trial counsel rested the defense case without putting on any evidence. During closing arguments, Bunton's trial counsel argued, in pertinent part, that White lied during his testimony. Id., Vol. 6 at 412 ("People make mistakes, but I am here to tell you Mr. White was lying. He was lying."). In support of this argument, Bunton's

14

counsel pointed both to internal inconsistencies in White's testimony, as well as inconsistencies between White's testimony and the prosecution's other evidence. Notwithstanding these arguments, however, the jury ultimately convicted Bunton of first degree murder.

*b) Relevant evidence produced during the Rule 35(c) proceedings*

In his postconviction Rule 35(c) motion, Bunton alleged, in pertinent part, that his trial counsel was ineffective for failing to present Bursie or any other witness to support the theory, suggested during the cross-examination of White, "that White falsely testified because of a crush he may have had on" Bursie. State ROA, Vol. 2 at 96. The state district court conducted an evidentiary hearing on Bunton's Rule 35(c) motion, during which Keith Johnson, Bunton's trial counsel, testified. According to Johnson, he explored and rejected various defense theories (in particular insanity and self defense) and settled on a theory that the prosecution "would be unable to prove identification of . . . Bunton as the perpetrator." Id., Vol. 10 at 15. When asked about the possibility of presenting Bursie as a witness, Johnson acknowledged that she was present on the morning of the last day of trial, that "Bunton wanted her to testify," and that he (Johnson) "was ready to call her." Id. at 18. The following colloquy then occurred between the prosecutor, Johnson, and the state district court regarding Bursie's role as a potential defense witness:

Q. Was she an alibi witness?

15

A. No. There was no alibi defense.

Q. But it was more to explore her relationship with the victim and the defendant?

A. In a manner of speaking. There was some concern that Mr. Harrington was interfering or in some way trying to –

Q. Mr. Harrington, the victim?

A. – the victim, to break up Grace and Mr. Bunton.

Q. In your professional opinion could testimony of that nature have hurt the defendant as much as it could have helped him?

A. It was possible that either Harrington or Mr. White had some kind of crush or whatever on Grace or had some involvement with her. And I was concerned that that would supply a motive for the shooting. So it was Plan B for me. Plan A was the non-identification.

Q. And Plan B was?

A. Mr. Bunton wanted Grace to testify as the client. I wanted to do what he wanted me to do.

THE COURT: What was she supposed to say that was going to be helpful to him, if anything?

THE WITNESS: Well, Judge, at this point it's hard to remember exactly how I rationalized that. I just remember that I had a fear that it would supply a motive maybe that he was perhaps under attack by Mr. Harrington that may have been a self defense motive. The problem was even if she testified to – she said she wasn't present and there were people who said that Mr. Harrington's only gesture was an open thing [with his hands] as if he was explaining something [to Bunton].

Q. (By [the prosecutor]) The fact that she appeared and disappeared, that was through no fault of your own?

16

A.  No.  I told her to come back.  She did not.  When she was finally contacted, at that point I did tell her she was no longer needed because by then I had rested.

Id. at 18-19.  On redirect examination, Johnson conceded that he had informed the jury during his opening statement that a prosecution witness might have an improper motive to lie.  Id. at 33-34.  But on recross-examination Johnson stated that, despite this suggestion in his opening statement, he "at all times thought . . . that identification was [their] best defense," and it was Bunton who "thought that [they] should be talking about motive."  Id. at 34.  Accordingly, Johnson stated, he "tried to do both [i.e., pursue both defense theories] and in a way that didn't hurt" Bunton.  Id. at 34-35.

Notably, Bunton did not present Bursie as a witness at the Rule 35(c) hearing[4] or present any type of evidence indicating how Bursie would have testified if presented as a witness at trial.

*c) The CCA's resolution of the claim*

In affirming the state district court's denial of Bunton's Rule 35(c) motion for postconviction relief, the CCA stated:

> Finally, with respect to the third lay witness [Bursie], counsel testified at the Crim. P. 35(c) hearing that, even though this witness would have provided a motive for the witness to the murder [White] to lie about what he saw, she could have also provided a motive for defendant to commit the murder.  See Davis v. People, [871 P.2d 769 (Colo. Ct. App. 1994)] (trial counsel was not ineffective for failing to

---

[4] At oral argument in this appeal, Bunton's counsel indicated that Bursie died prior to the Rule 35(c) hearing.

call a witness who could have provided highly prejudicial information about the defendant on cross-examination).

Under these circumstances, we cannot say that trial counsel was ineffective for failing to call th[is] witness[].

Bunton II at 5.

*d) Bunton's challenge to the CCA's decision*

Bunton argues in this federal habeas appeal that the CCA's rationale for rejecting his ineffective assistance claim, i.e., the "supposed strategic reason for not calling . . . Bursie," Aplt. Br. at 26, "cannot sensibly be squared with [his] counsel's actions at trial and what he said at the Rule 35(c) hearing," id. at 27. In support, Bunton asserts that "[b]efore the jury, [his] counsel vigorously questioned . . . White about his interest in . . . Bursie," and thus "unmistakably put in issue that . . . White was lying because of his pursuit of" Bursie. Id. Bunton further asserts that his counsel "made the stark insinuation that . . . White was lying explicit in summation," and he contends "[t]he only possible motivation that the record even suggested was the one counsel had so studiously laid: that . . . White wanted a romantic rival out of the picture." Id. at 28. "Against this backdrop," Bunton argues, his "counsel's testimony at the Rule 35(c) hearing that he made a tactical choice not to call . . . Bursie falls flat." Id. In particular, Bunton notes, "counsel admitted [at the Rule 35(c) hearing] his recollection was that . . . Bursie would testify that *either* . . . White *or* . . . Harrington was interested in her." Id. (italics in original). Bunton argues that "[i]f the suitor was

18

. . . White, the supposed downside in calling . . . Bursie did not exist" because "White's interest would be no motive for . . . Bunton to kill . . . Harrington." Id. "And the transcript leaves no doubt," Bunton argues, "that [his] counsel believed at trial – the only time that matters – that it was . . . White who was pursuing . . . Bursie, and not . . . Harrington." Id.

Although Bunton appears to be suggesting that the CCA's rationale "was based on an unreasonable determination of the facts in light of the evidence presented in the State court [Rule 35(c)] proceeding," 28 U.S.C. § 2254(d)(2), a review of the record on appeal indicates otherwise. Johnson, Bunton's trial counsel, testified quite clearly at the Rule 35(c) hearing that "[t]here was some concern that . . . Harrington was interfering or in some way trying to . . . break up [Bursie] and . . . Bunton." State ROA, Vol. 10 at 18. Even though Johnson testified "[i]t was possible that either Harrington or . . . White had some kind of crush or whatever on [Bursie] or had some involvement with her," he ultimately stated he "had a fear that" presenting Bursie as a witness "would supply a motive" for Bunton shooting Harrington. Id. at 19. Thus, we conclude the CCA did not unreasonably determine the facts in violation of § 2254(d)(2).

Bunton also argues, relatedly, that because his "counsel's own actions at trial lay bare that his belief was that it was . . . White who desired . . . Bursie, his supposed strategic reason for not calling her collapses," and "[i]t was an unreasonable application of Strickland . . . for the [CCA] to endorse counsel's

decision on this basis." Aplt. Br. at 29. But it appears to be Bunton who is unreasonably construing the evidence presented at the Rule 35(c) hearing. As noted above, Johnson plainly testified at the Rule 35(c) hearing that his primary defense strategy was to simply challenge the sufficiency of the prosecution's evidence (i.e., his "Plan A"), and that it was Bunton who demanded that Johnson also pursue a strategy ("Plan B") of implying that White was romantically interested in Bursie and thus motivated to falsely implicate Bunton as the person responsible for shooting Harrington. Further, as explained above, Johnson also plainly testified that he was personally concerned that "Plan B" might backfire by providing the jury with evidence that Bunton had a motive for shooting Harrington.

Ultimately, we conclude the CCA did not unreasonably apply <u>Strickland</u> in determining that Johnson made a reasonable strategic decision to forego Bursie's testimony. By doing so, Johnson was able to adhere to his main defense strategy of simply challenging the sufficiency of the prosecution's evidence, while simultaneously placating Bunton by means of his cross-examination of White (and suggesting, by way of his cross-examination of White, that White might have had a motive to falsely implicate Bunton).

Finally, even if we were to assume, for purposes of argument, that the CCA unreasonably applied <u>Strickland</u> in determining that Johnson made a reasonable strategic decision to forego Bursie's testimony, we would still be left to

20

determine, de novo, whether "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the [trial] would have been different." Strickland, 466 U.S. at 694. And, on that issue, Bunton cannot prevail because he has failed to offer any evidence indicating how Bursie would actually have testified if presented as a witness. In particular, Bunton never presented to the state courts an affidavit from Bursie or anyone familiar with her possible testimony. Further, even assuming that Bursie would have testified that White was romantically interested in her, it is unclear whether Bursie would have been a credible witness. Finally, because another prosecution witness (Bolling) testified to having observed Bunton dragging Harrington's body from the street to the parking lot where it was ultimately found, it is doubtful whether any testimony from Bursie regarding White's purported romantic interest in her would have prompted the jury to reach a different verdict.

For these reasons, we conclude Bunton is not entitled to federal habeas relief on his claim that Johnson was ineffective for failing to present Bursie as a witness at trial.

*Trial counsel's failure to properly impeach White*

In his second claim on appeal, Bunton contends his trial counsel "was derelict in failing to impeach [Darrell] White with his taped police statement." Aplt. Br. at 30. "In that statement," Bunton asserts, "White put his car at a point [on Welton Street] from which it would have been impossible to see to the area on

21

26th Street where the murder happened," and, "[i]ndeed, he would not have been able to see any part of that street, save for the area right at the corner." Id.

*a) The relevant trial proceedings*

At trial, White testified on direct examination that, after working for a while inside Ladies Choice on the evening of April 7, 1986, he walked out to his car to smoke a joint and listen to a tape. State ROA, Vol. 5 at 120-21. According to White, his "car [was parked] in front of the Ladies Choice," which the record indicates was located on Welton Street between 25th and 26th Streets.[5] Id. at 120. The record indicates that the parking spots along Welton Street near Ladies Choice were intended for parallel parking, and White testified that his car was parked on Welton Street facing north toward 26th Street[6], id. at 124, and that he was seated in the front passenger seat in a position that allowed him to see both in front of (i.e., towards 26th Street) and in back of (i.e., towards Ladies Choice) his car, id. at 125.

White then proceeded to describe the events leading up to the shooting of Harrington. According to White, he observed Bunton leave Ladies Choice, walk

_____

[5] During his testimony, White, at the request of the prosecutor, marked on an exhibit where his car was located. That exhibit, however, has not been included in the record in the instant appeal.

[6] Because Welton was a one-way street, there were parking spaces on the left (or west) side of the street. By parking in that area, the driver's side of White's car would have been next to the sidewalk that ran in front of Ladies Choice.

22

north on the sidewalk of Welton Street toward 26th Street, and round "the corner on 26th Street." Id. at 126. White testified that, shortly thereafter, Harrington and Speer left Ladies Choice together, walked up the sidewalk of Welton Street toward 26th Street, rounded the corner onto the sidewalk of 26th Street, and met up with Bunton. Id. at 126-27. White further testified that he observed the three men engage in a verbal argument (he described it as an argument "because of the hand movements"). Id. at 127. While Harrington was standing with his hands out towards Bunton apparently explaining something, White testified, Bunton "reach[ed] into his pants, pull[ed] out a revolver, and sho[t]" Harrington in the face. Id. at 129. White testified that Harrington, who was unarmed, "fell backwards and landed on the ground." Id. at 132. White was asked by the prosecutor if, from where he was seated in his car, he was "able to see well all the way down the sidewalk to the corner . . . and into this area [apparently referring to the area where the shooting occurred]?" Id. at 134. White testified, "Yes." Id.

White then described the events that occurred immediately after the shooting. According to White, Bunton walked to the corner of Welton and 26th Streets, then returned to where Harrington was laying on the sidewalk. Id. at 134-35, 138-39. White testified that he then observed Bunton and Speer bending over and subsequently moving Harrington's body. Id. at 139. White testified that the three men disappeared from his sight behind a building for a short period of time, and then Bunton and Speer came back into view. Id. Bunton and Speer then,

23

according to White, walked past his car and back towards Ladies Choice, arguing along the way. Id. at 140-41. White testified that he did not observe Bunton and Speer return back inside Ladies Choice, but he assumed that they did so. Id. at 141. White further testified that he then "drove off" in his car, "took a left on 26th Street and passed by" the location where Harrington's body had been dragged, "went around the block" and then told the manager of Ladies Choice, Charles Butler, that "somebody had been shot." Id.

On cross-examination, Johnson questioned White at length about the details of the alleged shooting. Johnson did not, however, substantially question White regarding the precise location of his car on the evening of the shooting. Nor did Johnson at any point question White regarding his pretrial statements to Detective Antuna or his testimony at the preliminary hearing. Following White's trial testimony, the jury was transported to the scene of the crime so that they could view it in person.

During closing arguments, Johnson questioned whether the prosecution's evidence was sufficient to prove beyond a reasonable doubt that Bunton was responsible for shooting Harrington. In doing so, Johnson focused at one point on whether White was able to see the events he testified to:

> Nothing that happened on this diagram the way it's put – there is the
> way it appears in the pictures – nothing that happens on this diagram
> the way it's put there could have been seen by this person
> [apparently referring to White]. * * * It's unbelievable that a man
> sitting in that car, any car down there, and we don't know what kind

24

of car it is, a man sitting in any car down there could see what happened in these pictures. Impossible.

Id., Vol. 6 at 427.

*b) Relevant evidence produced during the Rule 35(c) proceedings*

In the hearing on his postconviction Rule 35(c) motion, Bunton's postconviction counsel questioned Johnson, Bunton's trial counsel, about White's testimony. To begin with, Johnson was asked if he "presented any prior inconsistent statements of . . . White . . . in the case?" Id., Vol. 10 at 9. Johnson responded that he was "never . . . able to locate" White prior to trial, and that "the first time [he] heard . . . White's testimony, other than the preliminary hearing, was at the trial and it had changed somewhat but not a lot." Id. at 9-10. Johnson was then asked if he "ha[d] a transcript of the audiotaped testimony of April of 1996, by Detective Antuna in which . . . White gave videotaped testimony?," to which he responded, "I was not aware of the existence of videotaped testimony and wasn't aware of audio until sometime after the trial itself."[7] Id. at 10. Bunton's postconviction counsel then asked Johnson a series of questions regarding the position of White's vehicle, White's ability to observe the shooting, and the importance of White's testimony to the prosecution's case:

Q. And you reviewed the crime scene and was it your determination

---

[7] When asked by the state district court about the availability of the videotape, Bunton's postconviction counsel stated: "The videotapes have been destroyed. There is an audiotape of that testimony, Your Honor, and we have a transcript of that." State ROA, Vol. 10 at 10.

25

that Mr. White could not have seen what he had testified that he saw?

A. His testimony, as I knew it, was going to place him at a point where he would have been looking at the northern-most building which is the, or was at that time, the Black History Museum. I did not believe he could see anything that would be further down 26th Street than about halfway down the block. When he testified he moved his position to a point very close to the corner of 26th and Welton, he would have been able to see the entire block past the alley. If the shooting had taken place on the sidewalk, he would have been able to see it. I did not believe it had taken place on the sidewalk, however.

Q. You mean at trial when he testified where his car was parked; is that correct?

A. Correct. He discussed being further down south on Welton towards the Ladies Choice. After cross-examination, on redirect examination, his position moved north towards the corner in a maybe plausible way.

Q. Was it your theory of the case that Mr. White could not have seen the shooting because of where he was located at?

A. No. My theory was she [Johnson appears to have been referring to the prosecutor] could not identify Mr. Bunton because of the different problems that each of the witnesses had. There were several witnesses who were in the area, none of whom testified or made statements that they had actually seen Mr. Bunton fire the shot.

Q. Except for Mr. White?

A. With one exception.

Q. So it was critical that you refute Mr. White's testimony since he was the only witness that testified he actually saw the shooting; is that correct?

A. Honestly I can't say he was critical. I thought that his testimony was tainted somewhat by his actions [perhaps referring both to his conduct after the shooting, i.e., failing to timely report it, and his

conduct at trial, which apparently included smirking] and by his character [White had at least two prior felony convictions that the jury was made aware of]. I didn't think he would, if you will, place as well with the jury as Carrie Bolling. I was much more concerned about her having just heard the shot even with the prescription drugs [she regularly took tranquilizers before going to bed, and did so on the night of the shooting] and the alcohol [although Bolling regularly visited Ladies Choice, she denied doing so on the day of the shooting, and there's otherwise no indication in the trial transcript that Bolling had been drinking prior to the shooting]. And, as I recall, she didn't even put on her glasses but she was directly across the street. She heard the shot and looked out and identified Tyrone Speer and Shasta who she said was also known as Michael Bunton.

Id. at 12-14.

On cross-examination, the prosecutor questioned Johnson about whether he had been furnished with a copy of the audiotaped/videotaped police interview with White:

Q. Did you receive discovery from the district attorney's office in this case?

A. I did. As I pointed out, however, I don't recall a videotape or an audiotape.

Q. Would it refresh your memory if you reviewed the supplementary report which refers right in there a statement of Darrell White as to whether or not you were furnished with one?

A. It would help if you had one that said that I received it.

Q. That I don't. Referring to page 8 of 9.

A. 8 of 9 refers to a videotape which I would have read. As I said, I have no memory of receiving it or seeing it but that does not mean it didn't occur.

* * *

27

A. If I remember correctly, there was a videotape room in the back of the D.A.'s Office and Al, you and I, all three of us, looked at that videotape.

Q. Which one?

A. Of Darrell White but I never got a copy because later it was subsequently lost. That's what happened.

THE COURT: Is that before or after the trial?

THE WITNESS: That was before the trial, Your Honor.

Q. (By [the prosecutor]) To the best of your recollection then you were able to review it before it was lost?

A. It was. I didn't remember it.

Id. at 16-17.

Later on in cross-examination, the prosecutor asked Johnson about his actions and strategy with regard to challenging White's testimony:

Q. (By [the prosecutor]) Why didn't you introduce any diagrams or photographs?

A. I was satisfied with the ones that the prosecution had done. From photographs and diagrams from the defense's perspective, I was much more inclined and asked for and received to have a jury view where the jurors actually went out to the scene and saw the actual location.

THE COURT: Well, the Judge took the jury out?

THE WITNESS: Took the jury out, yes. And I thought that the location lends itself very well to an understanding. And particularly given the testimony that they had heard and the way that they heard it, I was hopeful they would put Mr. White down in front of the Ladies Choice where he could definitely not have seen anything that occurred on 26th Street.

28

Q. So from day one it was your feeling that you would attempt to argue to the jury that Mr. White, who was an eyewitness to the shooting, could not have seen it?

A. Correct.

Q. And in a variety of ways by showing where he parked his car, the lighting conditions, the fact he was smoking marijuana, the distance that he was away and, as a matter of fact, wasn't he also exposed for having had a prior felony conviction?

A. Correct.

Q. So all of this information was put before the jury throughout direct and cross-examination?

A. Correct.

Q. And you had certain statements that he had made in the past that you could impeach him with during the course of his testimony?

A. As a matter of trial strategy I was concerned that the statements he made were not so wrong or so outlandish that they couldn't be covered up, that there wouldn't be a plausible explanation for the discrepancies and those being who tells the same story the same way twice. So I was not so much leaning on that as I was upon location and character and the way he played with the jury. I sought to annoy him during my cross-examination so they would see just what kind of a person he was. And I was okay with what had happened. I was not happy that he had changed some of the details of his story. But I felt that the cross-examination had been successful and thought that we were well on our way to winning the case.

Id. at 26-28.

On redirect, Bunton's postconviction counsel questioned Johnson about White's videotaped testimony and its potential usefulness to the defense at trial:

Q. Now, you had reviewed the videotaped testimony of his [White's] first statement to the detective, correct?

29

A.  Yes.  I'm sorry.  I'm sorry that I didn't remember that when we were talking.

Q.  You said that it was lost.  You were unable to get a copy of it?

A.  I did not get a copy.

* * *

Q.  Had you obtained audiotaped testimony which stated that he [White] was parked in front of a Do Not Park sign, would that have been relevant to this situation?  Do you remember seeing where the Do Not Park sign was?

A.  If I had focused on that and knew that to be the case, I could have looked at the Do Not Park sign when I visited the crime scene.  Yes, that would have been significant.

Id. at 30-31.

*c) The state district court's resolution of the claim*

Approximately two weeks after the conclusion of the evidentiary hearing on Bunton's Rule 35(c) motion, the state district court held a separate hearing during which it orally denied Bunton's motion.  In doing so, the state district court specifically rejected Bunton's claim that Johnson should have more thoroughly cross-examined White regarding the positioning of his vehicle, particularly based on statements White gave during his videotaped/audiotaped interview with Detective Antuna:

> [I]t [wa]s very difficult for me to figure out exactly what [White was] saying [in the interview].  I mean, I repeat it.  "Was there any cars in front of you?"  "No.  The only car in front of me, because where my car was was a sign that says Do Not Park after this time and then there was the car."  Now, I don't know if he's saying he was

30

parked behind the sign, in front of the sign or where because I guess you can draw from that that perhaps he's saying he was behind the sign. But, in any event, and I think it was demonstrated beyond any doubt at all, that if he was in a car parked behind the sign, he would not have been able to see down the street and see the shooting. But, nonetheless, I mean, first of all, it's pure speculation as to what the witness might have said at trial had he been cross-examined about this statement. Second, and you are dealing with a witness who not only has no ostensible motive to testify in the fashion that he did but who was clearly very, very reluctant, did not come forward for some period of time after the homicide in question, was fearful, as one might anticipate, and it's just pure speculation to think that his testimony in any vital respect would have been damaged by cross-examination by the use of this statement. And, secondly, the jury had an opportunity to go out there and look for themselves and see what sort of field of vision was available to the witness.

\* \* \*

So, anyhow, reduced to its shorthand terms, I do not feel that had Mr. Johnson done all the things that current counsel suggests he should have done, that I'm not the least bit convinced that the outcome would have been a single bit different. And that's not to say that Mr. Johnson did the greatest job in the world but that's not the standard.

Id., Vol. 12 at 5-6, 8.

*d) The CCA's resolution of the claim*

The CCA, in affirming the state district court's denial of Bunton's Rule 35(c) motion for postconviction relief, rejected this claim due to Bunton's failure to include in the record on appeal a copy of the trial exhibit upon which White marked the position of his vehicle:

Defendant next contends that his trial counsel was ineffective for failing to cross-examine the only eyewitness to the murder [i.e., White] about certain prior inconsistent statements – specifically, the witness' pretrial statements concerning . . . the location of his car at

31

the time of the murder . . . . Again, we disagree.

> With respect to the eyewitness' statements concerning the
> location of his car at the time of the murder, we are unable to discern
> from the record before us whether his pretrial statements were
> inconsistent with his trial testimony. Because the exhibit the witness
> referred to at trial was not included in the record, it is unclear exactly
> what his testimony in that regard was. We, therefore, presume the
> trial court's ruling was correct.

> \* \* \*

> Accordingly, we reject defendant's contention that trial counsel
> was ineffective for deciding not to cross-examine these witnesses.

Bunton II at 5-7 (internal citations omitted).

*e) Bunton's challenge to the CCA's decision*

In this federal habeas appeal, Bunton acknowledges that the CCA "did not

reach th[e] issue . . . because the trial exhibit on which Mr. White marked his

position was not included in the record on appeal from the denial of

postconviction relief."[8] Aplt. Br. at 30-31. But he challenges the CCA's

conclusion that "the exhibit [was] needed for a resolution of the claim," arguing

that, "[e]ven without the exhibit, the claim was one with a more than sufficient

record to be decided." Id. at 31. More specifically, he argues that "[t]he record

in the state appellate court – which also included the transcript of Mr. White's

police statement and the Rule 35(c)'s recitation into the record of the relevant

---

[8] Bunton also acknowledges that "[t]he federal district court deemed this to
be a procedural default that made this allegation of ineffectiveness unavailable to
[him] absent a showing of cause and prejudice, or actual innocence." Aplt. Br. at
31.

questions and answers – was thus wholly adequate to review this strand of [his] ineffective-assistance claim, and there is no procedural default that is adequate to defeat federal review." Id. at 32.

Federal habeas courts are prohibited from "review[ing] a question of federal law decided by a state court if the decision of that court rests on a state law ground that is independent of the federal question and adequate to support the judgment." Coleman v. Thompson, 501 U.S. 722, 729 (1991). In other words, this so-called "independent and adequate state ground doctrine . . . . applies to bar federal habeas when a state court declined to address a prisoner's federal claims because the prisoner had failed to meet a state procedural requirement." Id. at 729-30. "In the habeas context, the application of the . . . doctrine is grounded in concerns of comity and federalism." Id. at 730. "Without the rule, . . . habeas would offer state prisoners whose custody was supported by independent and adequate state grounds an end run around the limits of th[e] [Supreme] Court's jurisdiction and a means to undermine the State's interest in enforcing its laws." Id. at 730-31.

Bunton does not appear to dispute that the CCA's decision rested on a state law ground "independent" of the federal question posed by his claim. He does, however, appear to be asserting that the state law ground relied on by the CCA was not adequate to support the underlying judgment. "The question whether a state procedural rul[e] is adequate is itself a question of federal law." Beard v.

33

<u>Kindler</u>, 130 S.Ct. 612, 617 (2009). The adequacy inquiry "ask[s] whether the state rule in question was 'firmly established and regularly followed.'" <u>Id.</u> (quoting <u>Lee v. Kemna</u>, 534 U.S. 362, 376 (2002)).

Respondents argue that under Colorado law, "appellants bear the burden of providing reviewing courts with a proper record with which it can address his or her appellate claims." Aplee. Br. at 25 (citing Colo. App. R. 10(b)). "In the absence of an adequate record," respondents assert, "the reviewing court [under Colorado law] must presume that the judgment was proper." <u>Id.</u> Applying those principles in this case, respondents argue that, "[w]ithout the trial exhibit [referred to by the CCA], it is difficult to assess from the trial testimony exactly where Mr. White placed his location." <u>Id.</u> at 26. "As such," respondents argue, "it would be impossible to conclude that Mr. White's pretrial statements were actually inconsistent, much less so inconsistent that trial counsel was ineffective for failing to use them for impeachment." <u>Id.</u>

Colorado Appellate Rule 10(a), entitled "Composition of the Record on Appeal," lists the specific items from the trial court that "shall constitute the record on appeal in all cases." Colo. App. R. 10(a). In turn, Colorado Appellate Rule 10(b), cited by respondents in this case, provides that it is an appellant's duty, if necessary, to file "with the clerk of the trial court and with the clerk of the appellate court in which the notice of appeal has been filed . . . a detailed designation of record, setting forth specifically those portions of the record" that

the appellant also wants included in the record on appeal. Colo. App. R. 10(b). Together, these two subsections clearly require an appellant to specially designate any trial court exhibits that the appellant believes are necessary for resolution of the appeal and that are not, under subsection (a), routinely included in the record on appeal. Finally, research indicates the CCA regularly employs Colo. App. R. 10(b) when it believes a record on appeal is inadequate to allow for proper review of a claim. E.g., People v. Tolbert, 216 P.3d 1, 3 (Colo. Ct. App. 2007); In re Marriage of Tagen, 62 P.3d 1092, 1096 (Colo. Ct. App. 2002); People v. Helmstetter, 914 P.2d 474, 476-77 (Colo. Ct. App. 1995).

Although the CCA did not cite to Colo. App. R. 10(a) or (b) in this case, its decision on the ineffective assistance claim in question obviously rests on the principles outlined in these two subsections. As we have noted, it was Bunton's responsibility, in appealing the state district court's denial of his Rule 35(c) motion, to specially designate as part of the record on appeal any and all exhibits that were necessary to a resolution of his ineffective assistance claim. And, in the CCA's view, this clearly included the trial court exhibit upon which White designated the position of his vehicle.

Although Colo. App. R. 10(b) affords the CCA discretion to determine whether a record on appeal is adequate to allow for appellate review, that does not, standing alone, render Colo. App. R. 10(b) inadequate under federal habeas law. Beard, 130 S.Ct. at 618 ("We hold that a discretionary state procedural rule

35

can serve as an adequate ground to bar federal habeas review."). And, although Bunton takes issue with the CCA's determination that the trial exhibit on which White marked the position of his car was necessary to resolve Bunton's ineffective assistance claim, nothing in the record on appeal substantially undermines that conclusion. Indeed, a review of the trial transcript clearly confirms that White was asked to mark on an exhibit where his car was positioned at the time he observed the shooting of Harrington. Without that exhibit, it is impossible to determine from the transcript alone precisely where White asserted he was parked.

Thus, in sum, we do not reach the merits of this claim because we conclude the claim is procedurally barred.

*Cumulative error*

Lastly, Bunton argues that even if "there is not sufficient prejudice from either [of the first two] error[s] standing alone, the cumulative harm from the errors establishes Strickland prejudice." Aplt. Br. at 49. The initial problem with this argument is that Bunton does not appear to have asserted it in his state postconviction Rule 35(c) proceeding, and thus the CCA never addressed the argument. See Cargle v. Mullin, 317 F.3d 1196, 1206 (10th Cir. 2003) (noting that the petitioner in that case exhausted his cumulative error argument by asserting it on both direct appeal and state postconviction). In any event, the cumulative error doctrine does not apply here because we have not found the

36

existence of two or more actual errors. See generally Castro v. Ward, 138 F.3d 810, 832-33 (10th Cir. 1998) (noting that cumulative error analysis applies where there are two or more actual errors, and thus does not apply to the cumulative effect of non-errors).

The judgment of the district court is AFFIRMED.